## In re AMERICAN SOLAR KING CORP., Debtor.

### Bankruptcy No. 6–86–00527.

United States Bankruptcy Court,
W.D. Texas,
Waco Division.

Sept. 1, 1988.

Benjamin Harvey, Waco, Tex., for American Solar King Corp.

H. Rey Stroube III, S. Margie Venus, Akin, Gump, Strauss, Hauer & Feld, Houston, Tex., Donald R. Taylor, Akin, Gump, Strauss, Hauer & Feld, San Antonio, Tex., for Solar Resources.

Gary B. Clark, Gardere & Wynne, Dallas, Tex., for Cardinal Inv. Co., Inc.

David Dickson, Sheehy, Lovelace & Mayfield, Waco, Tex., for Sears, Roebuck & Co.

Richard J. VanderWoude, Sheehy, Lovelace & Mayfield, Waco, Tex., for Patrick B. McSpadden, et al.

M. Susan Hardie, Butler & Binion, Houston, Tex., for Western Federal Sav. & Loan Ass'n.

## MEMORANDUM OF DECISION

LEIF M. CLARK, Bankruptcy Judge.

American Solar King Corporation ("ASK"), a publicly traded corporation with between four and five million dollars worth of unsecured debt, submitted its Second Amended Plan of Reorganization for confirmation on July 7, 1988. The company had manufactured and marketed a solar panel heat cogeneration unit, relying on perceived federal tax benefits to raise the capital for the manufacture and installation of the units from limited partnerships formed to "acquire" the solar heating

units.[1] ASK also had a marketing arrangement for its products through Sears, Roebuck & Co. and the Tennessee Valley Authority. Changes in the tax laws (together with severe dissatisfaction on the part of investors) helped to shove the company into bankruptcy, from whence it now seeks to emerge, armed with a new, patented product, the "Energymaster" desiccant air conditioning system, and a private placement issue of $7 million worth of new common stock. There are currently two "white knights" awaiting in the wings, prepared to buy this issue. The two white knights emerged literally on the eve of confirmation, and their identities were thus not disclosed in the debtor's Second Amended Disclosure Statement.

One of the limited partnerships, Solar Resources, currently has a lawsuit with ASK set to go to trial in September 1988. Perhaps sensing a litigation advantage, Solar Resources launched a very late but very intense attack on the debtor's plan.[2] At the confirmation hearing, it was joined by another group of limited partners whose prepetition settlement with ASK is now the target of a preference action. Another entity, Cardinal Investments, also opposed the plan. Cardinal Investments is a defendant in securities litigation initiated by ASK, and brought a counterclaim in that litigation alleging losses at the game of selling ASK stock short.[3] The largest unsecured trade creditor, Sears, Roebuck & Co., supported the plan, as did the largest secured creditor, Western Federal Savings & Loan Co.[4]

Prior to the hearing, Solar Resources requested and obtained an expedited hearing on its motion for estimation of its claim for voting purposes. The court estimated the Solar Resources claim at $1,382,800, then offset that amount by what the court then estimated to be the present value of ASK's claim against Solar Resources, represented by a long term note due in 1994 in the face amount of $937,000. At the confirmation hearing, the debtor presented through the testimony of the ASK's president evidence in support of confirmation, including a summary of the ballots received from voting creditors. No written summary was either prepared or submitted, though the ballots themselves, at the court's request, were tendered. Solar Resources uncovered errors and inconsisten-

1. These limited partnerships then acted as a private "utility," selling the heat cogeneration to various end users for user fees designed to approximate the interest payments on long term notes payable to ASK. Many of the limited partnerships engaged in litigation with ASK both before and after the bankruptcy ("utilities suits"). These suits generally involve allegations by the limited partnership of mismanagement, negligence, and misrepresentation, and counteractions by ASK seeking to enforce the long-term notes the limited partnership owes ASK. Of note is that, in most of these transactions, the limited partners executed personal guaranties of the partnership note, perhaps explaining the fervor with which these suits have been pursued.

2. No better plan is waiting in the wings, nor has Solar Resources been at all involved in the reorganization process before now. Solar Resources does not contend (nor could it) that liquidation is likely to yield more to unsecured creditors than would reorganization. Liquidation would, however, virtually eliminate any further chances of ASK's pursuing Solar Resources on its long term notes, and it is this rather selfish litigation advantage which evidently motivates Solar Resources. Needless to say, no creditors can be expected to benefit from the destruction of ASK, other than those limited partnerships which, like Solar Resources, face the prospect of paying the piper should ASK survive. The court was not asked to disregard the ballots of Solar Resources under 11 U.S.C. § 1126(e).

3. Cardinal Investments has not previously participated in this bankruptcy proceeding and did not object to the Second Amended Disclosure Statement.

4. Western Federal conditioned its acceptance on a modification of the plan to the effect that the promised capital infusion from the white knight have a deadline of ninety days after confirmation, lest the debtor have its discharge without having to produce on its promise. Western Federal and the debtor also agreed, for plan voting purposes, to limit its unsecured (Class III) claim to $441,000.00. For the reasons set out in this opinion, the modification was approved at the hearing. With these modifications, Western Federal changed its vote from a rejection to an acceptance, affirming to the court that the only consideration given for the change of vote was the stated modification. No other parties objected to the either the modification or the vote change.

cies in the debtor's method of tallying the votes, arguing that the debtor's conclusion that Class III had voted in favor of the plan was similarly flawed. Solar Resources also attacked the feasibility of a plan which relied so heavily on white knights appearing out of nowhere on the eve of confirmation with large satchels of cash. The group of limited partners the target of ASK's preference action joined Solar Resources in opposing the plan, adding that their rejections were not even counted as they should have been. Cardinal Investments argued that it was in fact an impaired creditor and had voted to reject the plan, yet its vote had been ignored because the plan treated Class V as unimpaired.[5] Its class, Class V, was to be subordinated pursuant to Section 510(b) of the Bankruptcy Code, with all claimants not currently stockholders to take nothing and be fully discharged.[6] At the hearing, the debtor decided to amend the treatment of Class V to delete the "take-nothing" language as to Cardinal Investments (the only member of the class so affected). The court took the entire confirmation matter under advisement and this opinion is the result.

## ISSUES PRESENTED

In order to confirm a plan of reorganization, a bankruptcy court must determine that all of the requirements of Section 1129(a) have been satisfied. Here, the evidence easily supports a favorable finding under subsections (a)(2), (3), (4), (6), (7), (9) and (10). The plan proponent has complied with Title 11, has disclosed the identity and future positions of current insiders, has demonstrated that the plan is proposed in good faith, as that term is intended in

5. Only Classes I and III were considered by the debtor to have been impaired, and only those two classes were furnished ballots for voting on the plan. Class I is the secured claim of Western Federal Savings & Loan Co. Class III is the general unsecured creditors, of which Solar Resources is one. Class V contains parties to various securities litigation against ASK, including the counterclaim of Cardinal Investments.

6. The only member of the class which does not currently hold stock is Cardinal Investments, whose claim arose from a short sale contract.

Section 1129,[7] has demonstrated that the plan is preferable to liquidation under chapter 7, has shown that priority claims are appropriately treated under subsection (a)(9), and has produced at least one impaired class (Class I, Western Federal) voting in favor of the plan.

Still to be determined are

(1) whether the debtor has satisfactorily disclosed the identity of future board membership, as required by subsection (a)(5),

(2) whether the plan otherwise complies with title 11 as required by subsection (a)(1) (i.e., whether Class V was improperly classified as unimpaired depriving its members of a chance to vote, and whether the class impermissibly discriminated in the treatment of its members), and if not, whether the plan may be modified to alter the treatment of Class V as suggested by the debtor at the hearing.

(3) whether all impaired classes have voted for the plan as required by subsection (a)(8) (or whether confirmation can be achieved over the rejection of the class under the "cramdown" provisions of Section 1129(b)), and

(4) whether the plan is feasible under subsection (a)(11).

## DISCUSSION AND ANALYSIS

## I. THE DEBTOR HAS ADEQUATELY DISCLOSED THE POST–CONFIRMATION COMPOSITION OF ITS BOARD OF DIRECTORS

■ Section 1129(a)(5)(A)(i) requires the court to find that

In a short sale, one party promises to sell a given stock to another party at a preset price and at a preset time, usually a few weeks hence. The profit to the seller turns on being able to purchase the stock to satisfy the contract for less than the contract's preset price. The very nature of the transaction is such that the short seller will not end up as a stockholder.

7. See Matter of Sun Country Development, Inc., 764 F.2d 406, 407 (5th Cir.1985); Matter of Jasik, 727 F.2d 1379, 1383 (5th Cir.1984).

The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan ...

11 U.S.C. § 1129(a)(5)(A)(i). The debtor's principal, Brian Pardo, admitted that it would be reasonable to expect that any new investor acquiring an interest in the company would also want to place one or more of its own candidates on the board of directors. He anticipated that all of the current directors would leave the board save for he and Dr. Kelly. Two potential investors were identified, Turner Properties and International Capital Trust ("ICT"). If Turner Properties made the investment, he anticipated two persons, Mr. Gatti and Mr. Winter, both associated with Turner Properties, would make membership on the board a condition of their investment. If the ICT group made the investment, then Mr. Alexander (who brought the offer to ASK) would be expected to be put on the board. Pardo was not able to say who would fill the remaining positions on ASK's six-member board, as that decision could not be made until an appropriate slate was drawn and submitted to the shareholders for approval, after the completion of the private placement.

The debtor's inability to specifically identify future board members does not mean that the debtor has fallen short of the requirement imposed in subsection (a)(5)(A)(i), because the debtor *at this point* has no particular individuals whom it proposes should serve, after confirmation, as a director, officer, or voting trustee, other than those whom it has already identified on the record. Though it is a fair presumption that board composition will change drastically if the promised equity infusion comes about, it will do so pursuant to the

company's own system of corporate governance (its articles of incorporation and by-laws) and in accordance with applicable state and federal law. If there were indeed individuals whom the corporation intended to have serve as a director, subsection (a)(5)(A)(i) would compel their disclosure. The subsection does not (and cannot) compel the debtor to do the impossible, however. If there is no proposed slate of directors as yet, there is simply nothing further for the debtor to disclose under subsection (a)(5)(A)(i).[8]

The entirety of subsection (a)(5) is derived from section 221 of the Bankruptcy Act, the confirmation standards for reorganization plans under Chapter X. The section required the court to find that

the identity, qualifications, and affiliations of the persons who are to be directors or officers, or voting trustees, if any, upon consummation of the plan, have been fully disclosed, and that the appointment of such persons to such offices, or their continuance therein, is equitable, compatible with the interests of creditors and stockholders and consistent with public policy.

11 U.S.C. § 621(5) (1976) (repealed); *see* Rule 10–307, Bankruptcy Rules of Procedure (1976) (abrogated); *see also* 6A *Collier on Bankruptcy,* para. 11.10 at p. 251 (14th ed. 1977). The section sought "to inject a proper measure of federal control, through the authorized discretion of the reorganization court, in supervising the rebirth of financially embarrassed enterprises ... for the benefit of the security holders and the public generally." 6A *Collier on Bankruptcy, supra.* The section made sense in the context of Chapter X, which replaced existing corporate governance with court-appointed trustees who then had to recommend new management in the plan. The Securities and Exchange Commission ("SEC") was an essential party to the Chapter X proceeding, whose report

---

**8.** There is precious little case authority on this subsection since the enactment of the Code, and no cases at all which analyze how it works. *See, e.g., In re AG Consultants Grain Division, Inc.,* 77 B.R. 665, 669 (Bankr.N.D.Ind.1987) (presuming without discussion that a plan must disclose the identity of individuals who *will* serve after confirmation); *In re Hoff,* 54 B.R. 746 (Bankr.D.N.D.1985); *Matter of Spring Garden Foliage, Inc.,* 17 B.R. 882 (Bankr.M.D.Fla. 1982).

was a mandatory prerequisite to confirmation. The Chapter X court approved plans *prior* to solicitation. "Chapter X was designed to impose rigid and formalized procedures upon the reorganization of corporations and, although designed to protect public creditors, has often worked to the detriment of such creditors." 124 Cong Rec H11101 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards).[9]

The Joint Bill (H.R. 8200) which was ultimately enacted as the Bankruptcy Reform Act of 1978 rejected the Senate's attempt to continue a Chapter X approach to reorganization for public corporations. In his floor remarks in favor of the Joint Bill, Rep. Edwards commented:

> The House amendment deletes the "public company" exception, because [*inter alia*] ... it is predicated on the myth that provisions similar to those contained in Chapter X are necessary for the protection of public investors. Bankruptcy practice in large reorganization cases has changed substantially in the 40 years since the Chandler Act was enacted. This change is, in large part, attributable to the pervasive effect of the Federal securities laws and the extraordinary success of the Securities and Exchange Commission in sensitizing both management and members of the bar to the need for full disclosure and fair dealing in transactions involving publicly held securities.

124 Cong Rec H11101 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards). Thus, the court under the Code is removed from its pervasive watchdog role, with the protection of public investors to be secured by applicable nonbankruptcy securities laws and the SEC's "ordinary course" regulation. Consistent with this change of emphasis is the fact that, while the SEC has standing to appear and be heard in the case (so that it may discharge the watchdog function imposed by nonbankruptcy Federal securities laws and regulations), it is no longer a party to the bankruptcy. 11 U.S.C. § 1109(a); 124 Cong Rec H11102 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards).

The rationale for disclosure of future management evaporates under the Code as enacted if the company's system of corporate governance is left undisturbed by the plan, unless a change in personnel is in fact contemplated at the time of confirmation. The court discharges its supervisory function by determining that the corporation's system of governance will remain undisturbed. Any change in the composition of the board will be cabined by the interplay of shareholder input conducted under the rules of full disclosure already imposed by state and Federal securities laws and the continuing scrutiny of state and Federal securities regulators.[10]

Because the plan does not propose to alter ASK's system of corporate governance and because the debtor has already disclosed that whatever changes worked in board composition will take place within the confines of that system of governance, the court holds that the debtor has satisfied the requisites of Section 1129(a)(5)(A)(i).

The debtor also disclosed that existing management will remain in place until such time as the board elects to make any changes (none of which are currently contemplated). It would clearly not be in the best interests of creditors to disturb management of the company at this critical

---

9. In his remarks, Representative Edwards further quoted from the House Report:

 The negative results under Chapter X have resulted from the stilted procedures, under which management is always ousted and replaced by an independent trustee, the courts and the Securities and Exchange Commission examine the plan of reorganization in great detail, no matter how long that takes, and the court values the business, a time consuming and inherently uncertain procedure.

124 Cong Rec 11101 (daily ed. September 28, 1978) (remarks of Rep. Edwards).

10. The SEC was a party to this case but did not participate in the confirmation hearing. Though it submitted comments regarding the *Second Amended Disclosure Statement* to debtor's counsel, it did not participate in the hearing on the approval of that disclosure statement either.

transitional juncture for the company.[11] The remaining portions of Section 1129(a)(5) have therefore been satisfied as well.

## II. THE PLAN AS MODIFIED COMPLIES WITH THE REQUIREMENTS OF TITLE 11, BECAUSE CLASS V IS NOW UNIMPAIRED.

Section 1129(a)(1) requires that the plan comply with the applicable provisions of Title 11. 11 U.S.C. § 1129(a)(1). One such provision is Section 1126(a), which entitles all holders of allowed claims to accept or reject a plan. 11 U.S.C. § 1126(a). Absent deemed acceptance under subsection (f) of that section or deemed rejection under subsection (g), the class must be permitted to participate in the balloting process to give effect to Section 1126(a).

Class V was not included in the solicitation process because the debtor assumed it was an unimpaired class deemed to have accepted the plan under Section 1126(f). Cardinal Investments objected to confirmation, contending that its class is indeed impaired and should therefore have been permitted to vote. Cardinal also pointed out that Class V should be deemed to have rejected the plan under Section 1126(g) because the plan does not entitle holders of claims in the class to receive or retain any property under the plan on account of their claims. *See* 11 U.S.C. § 1126(g). Thus, the debtor would have to successfully maintain cramdown of Class V under Section 1129(b) in order to obtain confirmation. This the debtor could not do, so the plan would fail.[12]

The debtor modified the plan at the hearing (and followed its oral motion with a written amendment) to eliminate the no-recovery language and argues that, with this modification, the class is now truly unimpaired. The debtor also argues post-hearing that Cardinal may in fact be a member of Class III anyway, where its vote might be diluted by the overwhelming support for the plan in that class. Finally, the debtor argues that only Cardinal objected, so it should make no difference what happens to the other members of Class V.

To resolve the issues raised here, the court must first determine into which class Cardinal should be placed. Then, the court must decide whether Class V is indeed impaired, absent amendment of the plan. If so, then the court must turn to the proposed amendment to decide (1) whether it may be permitted and (2) if so, whether it cures the infirmities of the plan as originally submitted.

### A. CARDINAL INVESTMENTS IS A CLASS V RATHER THAN A CLASS III CREDITOR

Class V consists of claims arising from various securities litigation against ASK, including an action currently pending in the district court awaiting class certification in the United States District Court for this district and division.[13] Cardinal Investments has a counterclaim against ASK in ASK's securities litigation against Cardinal and others, currently pending in the Northern District of Texas.[14] Cardinal complains that it lost money on a short sale contract

---

**11.** For a fuller discussion of current management and this court's conclusion that its continuation is in the best interests of the estate, see the discussion *infra* at IV.B.

**12.** Cramdown could not be successfully maintained. The plan says that Class V claims would be subordinated in accordance with Section 510(b), discussed *infra*. Assuming its appropriate application to the class, holders of claims would be placed on a par with common stockholders who, under the plan, retain their stock. Those Class V claims which do not currently hold stock in the company, however, would, by the plan's terms, retain nothing. The plan would thus fail because (a) it would violate Section 1123(a)(4), which requires the same

treatment for each claim or interest of a particular class, and (b) it would unfairly discriminate in contravention of Section 1129(b)(1). It would *not* fail by virtue of Section 1129(b)(2)(C)(ii), however, because there are no interest holders junior to the common stockholders, and hence no one junior who would be receiving anything under the plan.

**13.** The cases are styled *James Randall v. American Solar King Corporation, et al.* and *Howard Fine, et al. v. American Solar King Corporation, et al.*

**14.** This litigation is styled *American Solar King Corporation v. Weber Hall Sale, et al.*

to sell ASK stock. By selling "short," Cardinal intended to make money on the spread. Unfortunately, the price of ASK stock did not fall as Cardinal anticipated, so that there was a spread in the wrong direction. It now alleges that ASK, through various misrepresentations and other bad acts, artificially maintained ASK's stock prices, to the detriment of Cardinal.

■ If Cardinal's claim is characterized simply as one for damages caused by ASK's tortious conduct, then it might be included in Class III as an unsecured claim. If on the other hand its claim is more correctly one for damages arising from the sale of ASK securities, then Cardinal's claim belongs in Class V, where it is properly subject to the mandatory subordination provisions of Section 510(b).[15] This court concludes that a claim for damages arising from short sales of a company's stock is appropriately one subject to Section 510(b), as the damages ultimately derive from the attempted speculation in the company's stock, and so are subject to the same policy considerations which dictated the treatment of more traditional securities fraud claims in bankruptcy. *See* H.R.Rep. No. 595, 95th Cong, 1st Sess 194–196 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787; *In re Naftalin & Co.,* 333 F.Supp. 136, 138 (D.Minn.1971) ("... speculating by selling 'short,' gambling and predicting that market prices would decline so that later it could purchase the stock in the market before the time required to make delivery on the 'short' sale, and thereby realize a profit").

Section 510(b) resolved a difficult policy question concerning the relative status of a security holder who sues for damages based on his or her purchase. Commentators argued for mandatory subordination on an "allocation of risk" theory while the SEC opposed mandatory subordination, championing the cause of innocent investors duped by violations of state or federal Blue Sky laws. H.R.Rep. No. 595, *supra* at 194; *see* Slain & Kripke, *The Interface Between Securities Regulation and Bankruptcy: Allocating the Risk of Illegal Securities Issuance Between Security Holders and the Issuer's Creditors,* 48 N.Y.U. L.Rev. 261 (1973). The House Report found the arguments for subordination more persuasive:

> [R]ules of allocation in bankruptcy should be predicated on allocation of risk. The two risks to be considered are the risk of insolvency of the debtor and the risk of an unlawful issuance of securities. While both security holders and general creditors assume the risk of insolvency, Slain and Kripke conclude that the risk of illegality in securities issuance should be borne by those investing in securities and not by general creditors.

*Id.* at 195. Applying this allocation of risk analysis to the facts at hand leads easily to the conclusion that Cardinal assumed only the risk of unlawful issuance of securities when it trafficked in ASK's stock. A short sale is an investment strategy, one distinguished from ordinary investment only by its profiting on falling prices rather than on rising prices. The seller in a short sale transaction, unlike the ordinary unsecured creditor, welcomes the risk of insolvency, indeed counts on it. His only risk is an investment risk. Ordinary unsecured creditors on the other hand have not bargained for the sort of investment risk associated with short sales investment decisions. The logic which led to the passage of Section 510(b) applies even more forcefully to short sellers claiming damages than it does to the typical investor who assumes both the investment risk and the risk of insolvency.[16]

---

**15.** The section provides as follows:

> For purposes of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or an affiliate of the debtor, for damages arising from the purchase or sale of such a security, for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b) (Norton pamphl. ed. 1987).

**16.** The House Report noted that

> general creditors have not had the potential benefit of the proceeds of the enterprise deriv-

■ Cardinal Investments is thus properly classified apart from ordinary unsecured creditors, as are the remaining members of Class V, parties to securities litigation against the debtor. As discussed above, Section 510(b) contemplates disparate treatment of such claims for distribution purposes. Separate classification which acknowledges that difference is not inappropriate under either Section 1122 (classification of claims) or Section 1129(b) (prohibition on unfair discrimination). *See In re Ag Consultants Grain Division, Inc.*, 77 B.R. 665, 670–76. The plan thus complies with the applicable provisions of Title 11 insofar as its classification of Cardinal Investments as a Class V creditor and its classification of all such creditors separate from the unsecured creditor body in Class III.

### B. THE PLAN AS ORIGINALLY PROPOSED IMPAIRED CLASS V

Having determined that Cardinal Investments is indeed a Class V claimant, we can give credence to Cardinal's objection that its class had been improperly denied the opportunity to effectively participate in the confirmation process because Class V was not allowed to vote. According to the debtor, Class V had no affirmative right to vote because Class V was not an impaired class and so is deemed to have accepted a plan. *See* 11 U.S.C. § 1126(f); *In re Ruti–Sweetwater, Inc.*, 836 F.2d 1263 (10th Cir.1988). The debtor, it will be seen, is incorrect, as Class V is indeed impaired, though not because the class is left subject to the mandatory subordination provisions of Section 510(b).

1. Merely Making Claims Subject to the Provisions of Section 510(b) Does Not Render the Class Impaired Under Section 1124(1)

■ Insofar as the plan accords members of the class treatment in accordance with Section 510(b), Class V is not impaired. The Bankruptcy Code defines "impairment" broadly, thereby maximizing creditor participation in the confirmation process, i.e., even the smallest impairment nonetheless entitles a creditor to participate in voting. *See, e.g., In re Witt*, 60 B.R. 556, 561 (Bankr.N.D.Ia.1986). The Code carves out three narrow exceptions according to which a claim will be considered unimpaired (and hence not entitled to vote on the plan). *Matter of Madison Hotel Associates*, 749 F.2d 410, 418 (7th Cir.1984); *see* 11 U.S.C. §§ 1124, 1126(f). Under the first of these exceptions, a class of claims is deemed unimpaired if the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124(1). The question presented is whether the *de facto* subordination accomplished by Section 510(b) automatically renders the holders of such claims impaired for plan purposes (what we shall here call "impairment by statute") absent a plan provision to the contrary. Put another way, must a plan affirmatively "cure" statutory impairment in order to render the affected claims unimpaired?

· A closer inspection of the language employed in Section 1124(1) reveals "impairment by statute" to be an oxymoron. Impairment results from what the *plan* does, not what the statute does. *See* 11 U.S.C. § 1124(1) ("a class of claims ... in impaired under a plan unless ... the *plan* leaves unaltered the legal ... rights to which such claim ... entitles the holder of such claim ...") (emphasis added). A plan which "leaves unaltered" the legal rights of a claimant is one which, by definition, does not impair the creditor. A plan which leaves a claimant subject to other applicable provisions of the Bankruptcy Code does no more to alter a claimant's legal rights than does a plan which leaves a claimant vulnerable to a given state's usury laws or to federal environmental laws. The Bank-

---

ing from ownership of the securities and it is inequitable to permit shareholders that have had this potential benefit to shift the loss to general creditors.
*Id.* Though short sellers do not have this potential benefit, it is only because they are investing not so much in the stock itself as in the anticipated performance of the stock relative to the expectations of the marketplace. The distinction does not compel a different result, however. They have still assumed the risk of violation of the securities laws, a risk not assumed by general creditors. *Matter of Stirling Homex Corp.*, 579 F.2d 206, 214 (2d Cir.1978), *cert. denied*, 439 U.S. 1074, 99 S.Ct. 847, 59 L.Ed.2d 40 (1979).

ruptcy Code itself is a statute which, like other statutes, helps to define the legal rights of persons, just as surely as it limits contractual rights. *Cf. In re Timbers of Inwood Forest Associates, Ltd.*, 793 F.2d 1380, 1414–15 (5th Cir.1986), *aff'd rehrng en banc*, 808 F.2d 363 (1987), *aff'd* —— U.S. ——, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

Any alteration of legal rights is a consequence not of the plan but of the bankruptcy filing itself. *Cf. In re Sweetwater*, 57 B.R. 354, 357 (D.Utah 1985).[17] The mere filing of bankruptcy does not operate as impairment under Section 1124, which speaks in terms of the legal rights of a *claim*, itself a term of art referring to the call on estate assets that a creditor or interest holder holds as of the date of filing. 11 U.S.C. §§ 101(20), 502(a). It is the Bankruptcy Code itself which creates the concept of claims, according broader legal rights in some ways and restricting legal rights in other ways. Some claims are not immediately assertable outside of a bankruptcy filing (e.g., contingent claims) but are nonetheless cognizable once bankruptcy is filed. 11 U.S.C. § 502(c). By the same token, interest at the judgment rate on unsecured claims ceases to run once a petition is filed. 11 U.S.C. §§ 502(b), 506(a). If a plan leaves a claimholder subject to a given provision of the Code relating to the treatment of certain claims, the plan has certainly left unaltered the legal rights to which *such claim* entitles its holder.[18] In the given case at hand, the legal rights to which a claim for reimbursement or for damages arising out of the sale of the securities of a debtor entitles the holder of such a claim are defined in part by Section 510(b)—they are mandatorily subordinated "to all claims or interests that are senior to or equal the claim represented by such security." 11 U.S.C. § 510(b); *In re Amarex, Inc.*, 53 B.R. 888, 890 (Bankr. W.D.Okla.1985); *see Matter of Baldwin–United Corp.*, 52 B.R. 539, 540 (Bankr.S.D. Ohio 1985).

The decision of at least one court suggests that "impairment by statute" must be affirmatively *cured* by a plan in order to qualify as unimpaired under Section 1124(1). *In re Blackwelder Furniture Co. of Statesville*, 31 B.R. 878 (Bankr.W.D.N. C.1983). The case is, at the very least, distinguishable on its facts.[19] In *Blackwelder Furniture*, the bankruptcy court found that the floating lien automatically abrogated upon filing by Section 552(a)[20] had to be reinstated in the plan to avoid impairment of the claim. The court relied on the Senate Report's comment on Section 1124, which noted that "the intervention of bankruptcy and the defaults represent a *temporary crisis* which the plan of reorganization is intended to clear away." *Id.* at 881, *citing* S.Rep. No. 989, 95th Cong, 2d Sess 120 (1978), U.S.Code Cong. & Admin. News 1978, p. 5906 (emphasis in opinion). It then concluded that a plan would have to restore the secured creditor to its *original position*, i.e., the floating lien would have to be reinstated, to prevent the creditor's being impaired.

**17.** The *Sweetwater* court further noted that a plan may provide for the retention or enforcement by the debtor of any claim or interest, including in that case the determination of the validity of a disputed lien in the context of the lien avoidance powers of Section 544(a). If a debtor's right to use "strong arm" powers, available only in bankruptcy, to eliminate a security interest is not impairment by statute, then neither is mere subordination under Section 510(b), also available only in bankruptcy.

**18.** For comparison's sake, note that unsecured creditors will be treated as unimpaired under subsection (3) of Section 1124 if their allowed claims are paid in cash on the effective date of the plan. 11 U.S.C. § 1124(3). Because allowed unsecured claims do not include postpetition interest, the holders of such claims will be forced to forego interest at the judgment rate, yet will not be permitted to vote on the plan because they are deemed unimpaired. *See* 11 U.S.C. § 502(b). Ironically, under Chapter 7, interest at the judgment rate is permitted if the assets are sufficient to fund it. 11 U.S.C. § 726(a)(5); *see* 11 U.S.C. § 1129(a)(7)(A)(ii).

**19.** In point of fact, the case appears to have been decided incorrectly, as it relies on the faulty premise that the alteration of rights accomplished by the bankruptcy *filing* constitutes impairment.

**20.** [P]roperty acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case. 11 U.S.C. § 552(a).

The Court believes that the "original position" of a creditor can only refer to his pre-petition position and not to the position he might have occupied *vis-a-vis* the debtor and the debtor's property after the intervention of the "temporary crisis" of bankruptcy.

*Id.* at 881.

The portion of the Senate Report quoted in *Blackwelder Furniture* refers not to Section 1124(1), but to Section 1124(2), the *second* exception to impairment, which permits a plan to cure the effect of a default and to reinstate the *original terms* of an obligation "when maturity was brought on or accelerated by default." S.Rep. No. 989, 95th Cong, 2d Sess 120 (1978), U.S.Code Cong. & Admin.News 1978, p. 5906; *see* 11 U.S.C. § 1124(2). This second exception permits a debtor, through a plan, to "de-accelerate" a mortgage accelerated pre-petition. *In re Madison Hotel Associates*, 749 F.2d 410, 423 (7th Cir.1984); *See In re Taddeo*, 685 F.2d 24 (2d Cir.1982). The "original position" refers to the *pre-default* position, not just the pre-bankruptcy position. But for Section 1124(2), de-acceleration itself would be an impairment of rights, forcing the creditor to continue in a financing relationship which it had already decided to terminate prior to filing, and in that sense not much different from an involuntary substitution of obligors. *In re Barrington Oaks General Partnership*, 15 B.R. 952 (Bankr.D.Utah 1981). Nevertheless, claims which are de-accelerated pursuant to Section 1124(2) are deemed unimpaired. The portion of the Senate Report quoted by the *Blackwelder Furniture* court merely explains the rationale for the second exception to impairment. It tells us nothing about the first exception to impairment in Section 1124(1). To the extent

*Blackwelder Furniture* relied on the quoted language to support its interpretation of Section 1124(1), that reliance appears to have been misplaced.[21]

This court's rejection of "impairment by statute"—at least with regard to Section 510(b)—is more consistent with accepted principles of statutory construction. A statute should always be interpreted in such a fashion as to avoid conflicting results, results inconsistent with the essential purposes of the statute, or nonsensical results. It should also be interpreted in a fashion which gives substantive effect to all of its provisions. *South Carolina v. Catawba Indian Tribe*, 476 U.S. 498, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986); *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 103 S.Ct. 1556, 75 L.Ed.2d 534 (1983); *United States v. Hohri*, — U.S. —, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987); *United States v. Raddatz*, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980); *Bell v. New Jersey*, 461 U.S. 773, 103 S.Ct. 2187, 76 L.Ed.2d 312 (1983).

"Impairment by statute" would compel a result precisely in conflict with the intended purpose of Section 510(b). Unlike the situation in *Blackwelder*, where the creditor's lien could be restored through the plan, there is no mechanism here for fixing Cardinal's impairment short of defeating the very purpose of Section 510(b) to exclude such claims until other claims of equal or higher dignity have been satisfied. *See* discussion *supra* at II.A. The only way to "cure" the impairment would be to pay off all Class V claims in full. Because of the nature of the Class V claims, Class III would then have to be paid in full (or consent to *inferior* treatment), for cramdown under Section 1129(b)(2)(B)(ii) would

---

**21.** This court similarly rejects the reasoning in *In re Spirited, Inc.*, 23 B.R. 1004 (Bankr.E.D.Pa. 1982). That court concluded that a plan which purported to "recognize" the claims and interests of certain stock and debenture holders in fact impaired them, because "obviously neither class was to receive any payment or compensation." According to that court, Section 1124(1) requires a plan proponent "to agree to satisfy such claims or interests in accordance with the previously established rights of the parties." *Id.* at 1007. What should have been but apparently

was not obvious to that court is that not all interests, by their "previously established rights," have any right to payment or compensation. Stockholders, for example, have only a right to share in the company's good fortunes, and that only if the board of directors authorizes stock redemption or dividends. To the extent that *In re Spirited* requires affirmative payment or compensation of stockholder claims in order to render such claims unimpaired under Section 1124, the case is simply wrong.

not be available.[22] Instead of mandatory subordination, mandatory "prioritization" would result, rendering Section 510(b) meaningless.[23] It is difficult to believe that Congress intended to confer such an unwarranted advantage on the very class of claims it intended to mandatorily subordinate to unsecured creditors by virtue of Section 510(b). It may not be possible to "cure" *mandatory* subordination anyway. *See In re Amarex, Inc.,* 53 B.R. 888, 890 (Bankr.W.D.Okla.1985).

Section 1129 is designed to moderate the interests of competing creditors vis-a-vis the debtor and to steer the parties toward a consensual plan. *In re Jones,* 32 B.R. 951, 954 (Bankr.D.Ut.1983). To this end, each party is allocated a certain amount of bargaining leverage by the Bankruptcy Code. Creditors whose claims are impaired are compensated with voting rights not shared by their unimpaired counterparts. A ruling that "impairment by statute" is the sort of impairment contemplated by Section 1124(1) would deprive the debtor of the ability to ever promulgate a plan in which such creditors were deemed unimpaired and upset the very calculus which the statute was designed to promote. The only sensible interpretation is one which eschews "impairment by statute" as the sort of impairment contemplated by Section 1124(1).

### 2. The Plan Impairs Class V by Depriving Cardinal Investments of any Recovery Whatsoever

■■■■ However, the plan (prior to its modification on the record) nonetheless im-

paired Cardinal Investments, and hence Class V, because it purported to deprive holders of Class V claims of receiving anything if they did not currently hold any ASK equity securities (this would directly apply to the claim of Cardinal Investments). This treatment goes beyond Section 510(b), which would at the least accord members of the class the same treatment as that accorded to the holders of common stock under the plan. *See* 11 U.S.C. § 510(b) ("except that if such security is common stock, such claim has the same priority as common stock"). Under the plan, existing stockholders retain their stock. They therefore receive or retain property on account of their interests. *See Norwest Bank Worthington v. Ahlers,* —— U.S. ——, 108 S.Ct. 963, 969, 99 L.Ed.2d 169 (1988) ("even where debts far exceed the current value of assets, a debtor who retains his equity interest in the enterprise retains 'property.' ... a retained equity interest is a property interest ..."). All Class V claimants are entitled to the same treatment by the express provisions of Section 510(b). To the extent the plan goes beyond Section 510(b) to deprive them of any property on account of their claims, it impairs the class.[24]

### C. THE PLAN AS MODIFIED CURES THESE DIFFICULTIES, SO THAT THE PLAN THEREBY COMPLIES WITH THE APPLICABLE PROVISIONS OF TITLE 11

At the confirmation hearing, ASK moved to amend its plan to cure the defects associ-

---

**22.** The claims in Class V are held by disgruntled investors, a class normally considered junior to holders of unsecured claims. Because this class, under our scenario, would be receiving property, i.e., payment of their claims, the unsecured creditors senior to them could block cramdown, which prohibits junior claims from receiving anything until the target of the cramdown has been paid in full.

**23.** Of course, another way to "fix" the Section 510(b) impairment, without having to pay Cardinal's claim in full, would be to reclassify it as a Class III claim. This again would render Section 510(b) nugatory, however, as it would give Cardinal voting power in the very unsecured class from which Congress expressly intended to exclude holders of claims such as

Cardinal's, conferring unwarranted leverage on an investor to the detriment of genuine creditors who did not bargain for the investment risk that underlies the Class V claims. *See* discussion *supra* at II.A.

**24.** The plan as originally proposed would also violate Section 1123(a)(4), which prohibits discrimination among creditors within a given class, as it purports to deprive only Cardinal of any recovery on its action against ASK while letting other members of the class receive stock for their claims. To this extent, the plan also fails to comply with applicable provisions of Title 11, as required by Section 1129(a)(2). As indicated *infra,* the plan amendment cures this problem as well.

ated with Class V, memorializing this amendment in writing after the hearing, with appropriate service. No new disclosure statement was prepared. Objections were raised at the confirmation hearing and later filed by Solar Resources and Cardinal Investments that the plan modification should not be permitted because it fails to comply with Section 1125 of the Bankruptcy Code. No other parties have since filed objections. We here address (1) whether notice was adequate under the circumstances, (2) whether modification should be permitted and (3) whether the modification cures the objections.

### 1. Notice Was Adequate Under The Circumstances

■ Procedurally, notice was sufficient under the circumstances, even though the modification hearing was conducted along with the confirmation hearing. *In re Sweetwater,* 57 B.R. 354, 358 (D.Utah 1985); 11 U.S.C. § 102(1)(A). All parties who objected to the modification were present and represented by counsel. *See Matter of Texas Extrusion Corporation,* 844 F.2d 1142, 1161 (5th Cir.1988). Furthermore, the 20–day notice provision in Bankruptcy Rule 2002(a)(6) is inapplicable, since, as discussed *infra,* no further vote solicitation was required nor was there a need to fix a time within which "to accept or reject a proposed modification." *See* Bankr.R. 2002(a)(6) (1987).

### 2. The Proposed Modification May Be Permitted Without the Need for Further Disclosure or Solicitation

Section 1127 of the Code allows pre-confirmation plan modifications if the modified plan otherwise complies with classification, content, and disclosure requirements. 11

---

**25.** The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan.
11 U.S.C. § 1127(a).
The proponent of a modification shall comply with section 1125 of this title with respect to the plan as modified.

U.S.C. § 1127; *see* 11 U.S.C. §§ 1122, 1123, 1125.[25] The court may also deem acceptance or rejection of a modified plan by any claimant who accepted the original plan unless, within the time fixed by the court, a claimant changes its vote. 11 U.S.C. § 1127(d); *see* Bankr.R. 3019. We turn first to the issue of adequacy of disclosure [26] then to whether deemed acceptance is appropriate. Both, it will be seen, turn on the materiality of the proposed modification.

### a. No Further Disclosure is Required Because the Modification is not Sufficiently Material to Warrant Further Disclosure

■ Section 1127(c) requires that all modifications satisfy the adequacy-of-disclosure concerns of Section 1125. 11 U.S.C. § 1127(c). This does not necessarily mandate the preparation of a new disclosure statement and resolicitation of the plan, however. *See* H.R.Rep. No. 595, 95th Cong, 1st Sess 411, U.S.Code Cong. & Admin.News 1978, p. 6367 (1977) ("if the modification were sufficiently minor, the court might determine that additional disclosure was not required"); 5 *Collier on Bankruptcy,* para 1127.03, p. 1127–6 (15th ed. 1987) ("a new disclosure statement is not required in every case where a modification is requested"). Further disclosure occurs only when and to the extent that the debtor intends to solicit votes from previously dissenting creditors or when the modification materially and adversely impacts parties who previously voted for the plan.[27] The modification here proposed does not of itself contemplate further solicitation of classes or claimants, so our focus shifts to the materiality of the modification.

---

11 U.S.C. § 1127(c).

**26.** The modification itself cures the defect in classification and impairment discussed *supra.* If approved, the modification will comport with the requirements of Sections 1122 and 1123.

**27.** [T]he modified plan need not be resubmitted to creditors and interest holders if the court finds that they are not adversely affected. M. Bienenstock, *Bankruptcy Reorganization* 700 (PLI 1987).

 The following definition of materiality from *Collier*'s is instructive:

A modification is *material* if it so affects a creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance.

8 *Collier on Bankruptcy*, para. 3019.03, p. 3019–3 (15th ed. 1987). The severity of the modification need not be such as would motivate a claimant to *change* their vote— only that they would be apt to *reconsider* acceptance. A modification which is not likely to trigger such reconsideration *de facto* satisfies Section 1125 disclosure requirements.[28]

 As a result of the modification proposed in this case, the total number of equity shares will increase, causing a value-per-share dilution.[29] Thus, the amendment has a negative impact on Western Federal's Class I claim, the distribution for which will include equity securities, and on those unsecured creditors of Class III who elected to receive stock in lieu of cash. If the dilution is material, as defined above, further disclosure would be required and these classes should be given an opportunity to change their votes.

Because the plan allows some participants to choose among stock options and convertible debt, the total number of outstanding shares is yet unknown. It is therefore difficult to know precisely how much the modification will dilute the value of shares to be received by other claimants. The court therefore relies on the sensitivity analysis performed by the debtors in their disclosure statement. *See Second Amended Disclosure Statement*, pp. 42–45. The share distribution will need to be adjusted so that Cardinal will receive their "claim's worth" after the change. Cardinal values their claim at $148,317, subject to setoff.[30] Using the examples provided in the Disclosure Statement, and assuming that equity remains constant, Cardinal will receive up to .79% of the shares under the first scenario, and .86% of the shares under the second scenario.[31] A dilution of less than one percent (1%) is thus the outcome of the modification, a dilution which this court finds to be so small that no previously assenting creditor would be motivated to reconsider their vote because of it. Because the modification would not trigger reconsideration, the requisites of Section 1127(c) are satisfied by the existing disclosure statement.

b. *Other Accepting Claims are Deemed to have Accepted the Plan Because the Modification has no Material Adverse Impact on Their Treatment*

 The proponent of a modified plan may not, as a rule, use pre-modification acceptances solicited with a pre-modification disclosure statement, if the effect of

---

**28.** Ballots solicited with the original disclosure statement previously approved by the court will still be valid for the modified plan, because that disclosure statement is presumed already to contain "adequate information" to cover minor modifications. "Adequate information" is a term of art, defined by Section 1125 to be that disclosure necessary for a reasonable investor to make an informed judgment on whether to vote for a given plan. 11 U.S.C. § 1125(a)(1). A modification which is not "material" is by definition one which will not affect an investor's voting decision. Additional disclosure would serve no purpose and would therefore not be required. *See* M. Bienenstock, *Bankruptcy Reorganization* 700 (PLI 1987); 5 *Collier on Bankruptcy*, para. 1127.03, at 1127–6 to 1127–7 (15th ed. 1987).

**29.** Recall that, under the plan prior to modification, Cardinal Investments would have received nothing, not even stock. It is the additional stock which would have to be issued to Cardinal

Investments as a result of the modification which raises the possibility of dilution.

**30.** Cardinal's claim could legitimately be valued at zero. In their amended proof of claim, Cardinal acknowledged that its counterclaim is subject to setoff by the debtor's cause of action, stating that a settlement offer had been made by ASK and accepted by Cardinal, which would have resulted in mutual releases without further consideration by either party. ASK is alleged to have repudiated this settlement, and Cardinal insists that the settlement should be reinstated. Cardinal implicitly acknowledges that its claim is worth no more than ASK's offset. However, in view of the court's permitting the plan modification, Class V is unimpaired, so we never have to reach the issue of claim estimation.

**31.** Scenario 1: $148,317 claim/$18,822,637 equity = .0079; Scenario 2: $148,317 claim/$17,172,137 equity = .0086.

the modification is to substantially change other terms of the original plan. 11 U.S.C. § 1127(d); 5 *Collier on Bankruptcy*, para. 1127.01, p. 1127–3 (15th ed. 1987). However, Bankruptcy Rule 3019 allows a court to attribute prior acceptances to an amended plan where the modification "does not adversely change" a claimant's treatment.[32] The present rule was derived in part from Sections 223 and 364 of the Bankruptcy Act and their related bankruptcy rules, Rules 10–306 and 11–39, which allowed deemed acceptances for changes which did not "materially and adversely affect the interest" of a previously assenting claimant. 11 U.S.C. (repealed) §§ 623, 764 (Collier pamphl. ed. 1976); Bankr.R. Proc. 10–306, 11–39 (Collier pamphl. ed. 1976). Prior to the 1983 amendments to the Bankruptcy Rules, the materiality standard was explicit. Although the express criterion of materiality was dropped in the new rules, no significance should be attached to the omission, as congressional intent is clear:

> [A] creditor or stockholder who voted for or against a plan is deemed to have accepted or rejected the modifying proposal. But if the modification materially and adversely affects any of their interests, they must be afforded an opportunity to change their vote....

S.Rep. No. 989, 95th Cong, 2d Sess 124 (1978), U.S.Code Cong. & Admin.News 1978, p. 5910. *See also In re Jorgensen*, 66 B.R. 104, 109 (9th Cir. BAP 1986) ("material modification" violated Bankruptcy Rule 3019); *In re Mount Vernon Plaza Community Urban Redevelopment Cor-*

poration, 79 B.R. 305, 306 (Bankr.S.D.Ohio 1987) ("taken as a whole" the modifications did not adversely affect creditors).

A literal reading of the current rule would prevent a modified plan from being deemed accepted if it adversely affected the treatment of *any* claim in *any* way. Such an overstrict reading does not comport with the legislative history, nor is it in step with the approach of the Fifth Circuit in this area. In *Matter of Texas Extrusion Corporation*, 844 F.2d 1142, 1163 (5th Cir. 1988), the court rejected a literal reading of a companion rule, Bankruptcy Rule 3018 (which could, when read strictly, prohibit vote changes on the eve of confirmation), commenting that the belated vote change did not harm other creditors:

> [w]e find no error in the bankruptcy court's allowing the SBA to withdraw its rejection of the Plan and vote for the Plan. *See In re Jartran, Inc.*, 44 B.R. 331, 363 (Bankr.N.D.Ill. 1984). *See also* Bankruptcy Rule 3019. To allow this kind of self-serving objection to upset resolution of a complicated bankruptcy would make a travesty of the entire bankruptcy process. This observation also applies to a number of ... other picayune objections.

*Id.*, 1163.[33]

The rationale applies with equal force to Bankruptcy Rule 3019. The goal after all is consensual plans. Every time a plan has to be re-solicited, the risk that consensus will be lost is increased dramatically. Requiring such a formalistic step in the face of a merely technical negative impact heightens the risk of plan failure without

---

**32.** Bankruptcy Rule 3019 implements Section 1127 to provide:

> If the court finds after hearing on notice to the trustee, any committee appointed under the Code and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder ... it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.

Bankr.R. 3019 (1987).

**33.** In the *Jartran* decision, to which the Fifth Circuit made reference, the court recognized that, "in light of the spirit of Chapter 11 to

promote consensual plans," exceptional circumstances might warrant judicial discretion "notwithstanding the unequivocal language" of Rule 3018. *Jartran*, 44 B.R. at 363. These cases are instructive because of the relationship between Rules 3018 and 3019, regarding vote changes and plan modifications. Each may be traded, one for the other, as the plan participants attempt to hammer out a consensual plan. Much of this give-and-take occurs, literally, on the courthouse steps. As the Fifth Circuit recognizes, a mechanical reading of Rules 3018 and 3019 would inhibit this process and frustrate a fundamental objective of Chapter 11 to promote fully negotiated consensual plans.

satisfying any countervailing public policy. In truth, such an interpretation serves only the sort of "self-serving objections" which earned the approbation of the Fifth Circuit in *Matter of Texas Extrusion, supra.* The statute permits modifications that might technically have a negative impact on claimants where the modifications are not substantial. The rule should be interpreted in such a fashion as to give effect to, not to undermine, the statute. *See In re Wideman,* 84 B.R. 97, 100 (Bankr.W.D.Tex. 1988). Thus, if a modification does not "materially" impact a claimant's treatment, the change is not adverse and the court may deem that prior acceptances apply to the amended plan as well.

■ The modification sought here reinstates Cardinal Investments as a participant in the distribution made to other claims in Class V, entitling it to receive stock for its claim. As noted *supra,* the only adverse impact flowing from this modification is a miniscule dilution of the stock issue. The impact is not material and so will not impede the operation of Bankruptcy Rule 3019 to render the plan as modified "deemed accepted by all creditors and equity security holders who have previously accepted the plan." Bankr.R. 3019.

### 3. The Modification Cures the Impairment of Class V, Which is now Deemed to have Accepted the Plan

■ The modification removes the disparate treatment which impaired Cardinal in Class V. As modified, all Class V claimants will be subordinated under Section 510(b) and may be treated on parity with equity security holders. Equity shareholders will retain their shares under the plan, so that Class V claimants will inferably receive the equivalence of their claim in post-confirmation shares. Since Cardinal is no longer impaired, the class as a whole is unimpaired. *See* discussion *supra,* at II.B.2.

Under Section 1126(f) an unimpaired class is conclusively deemed to have accepted the plan. As a modified plan becomes the plan (*see* 11 U.S.C. § 1127(a)), this maxim applies equally to plans as modified.

This plan modification renders an impaired claimant (Cardinal Investments) unimpaired. Because, as a result, no members of Class V are impaired, the class itself is deemed to be unimpaired. Cardinal Investments, as well as other Class V claimants, are therefore deemed to have accepted the plan as modified. 11 U.S.C. § 1126(f). Likewise, the votes of other creditors whose claims remain unimpaired are deemed to have accepted the modified plan by operation of Section 1126(f). Finally, other claim or interest holders who accepted the plan prior to its modification are deemed to have accepted the plan as modified, by operation of Bankruptcy Rule 3019.

Accordingly, no further disclosure is necessary under Section 1125, the modification is allowed under Section 1127, unimpaired claims, including Class V claims, are deemed to have accepted the plan, and the court deems the modified plan accepted by all classes which accepted the plan prior to the modification. Having concluded that the modification is allowed, the final impediment to Section 1129(a)(1) is satisfied. The court therefore finds that the plan properly complies with all the provisions of Title 11.

### III. ALL IMPAIRED CLASSES HAVE ACCEPTED THE PLAN

Only two classes remain impaired under the plan as amended, Classes I and III. Class I is the secured claim of Western Federal Savings & Loan Association, which, as indicated above, changed its vote to an acceptance upon the debtor's modifying the plan to condition the efficacy of the plan on funding within sixty (60) days of confirmation. We first address Class I's vote change, then turn to Class III.

### A. CLASS I HAS ACCEPTED THE PLAN

■ Class I is the secured claim of Western Federal Savings & Loan Association ("Western Federal"). Immediately prior to the confirmation hearing, Western Federal and the debtor negotiated a workout of their differences, by which the debtor agreed to modify its plan to incorporate

a "drop dead" provision in the confirmation order (*see* discussion *infra* at IV.A.) and, in consideration therefor, Western Federal agreed to change its vote from a rejection to an acceptance of the plan. The court permitted the vote change at the hearing, even though the time for accepting or rejecting the plan had expired, in apparent contradiction of the express language of Bankruptcy Rule 3018.[34] Noone objected to either the modification or the vote change at the hearing.

 Bankruptcy Rule 3018 (like its companion, Bankruptcy Rule 3019) is not to be enforced with blind routine. It must instead be applied with an eye toward the fundamental principles of Chapter 11. The legislative intent is clear. The function of the statute is to foster consensus. *In re Jones*, 32 B.R. 951, 953 (Bankr.D.Utah 1983). To serve that intent, Bankruptcy Rule 3018 must not be applied in a wooden, mechanical fashion, lest it serve only as a device to aid recalcitrant creditors in their quest to selfishly scuttle otherwise equitable reorganizations on a mere technicality. That result is clearly inimical to the purpose of Chapter 11 reorganization. The Fifth Circuit has expressly excoriated such tactics, as does this court. *See Matter of Texas Extrusion Corp.*, 844 F.2d 1142, 1163 (5th Cir.1988); *see also* discussion *supra* at II.C.2.b.[35] Western Federal's acceptance was (and is) therefore permitted and Class I has thereby accepted the plan.

**34.** The rule provides as follows:
 ... For cause shown and within the time fixed for acceptance or rejection of a plan, the court after notice and hearing may permit a creditor or equity security holder to change or withdraw an acceptance or rejection.
 Bankr.R. 3018(a).

**35.** No formal objection was raised to the vote change either at or after the confirmation hearing. Thus any objection has been waived in any event. Furthermore, as no creditors are adversely affected, no creditors would have standing to raise the issue. *See In re Sweetwater*, 57 B.R. 354, 358 (D.Utah 1985). The court here addresses the issue solely to clarify the record and to address the potential for confusion created by the unfortunate wording of Bankruptcy Rule 3018.

## B. CLASS III HAS ACCEPTED THE PLAN

Class III consists of general unsecured claims of all kinds, including the claims of limited partnerships such as Solar Resources. Another group, whose contingent claims allegedly arise out of currently pending preference litigation, appeared at confirmation asserting their rejections should also be counted. To determine how Class III has voted, the court must first decide how these contingent claims should be handled for voting purposes. Then the contested claim of Solar Resources must be estimated for voting purposes.[36] The method for counting votes must then be established. Finally, the vote itself must be tabulated, with the result dictating whether Class III has accepted or rejected the plan. We turn first to the contingent claimants who are the target of preference litigation by the estate.

### 1. The Preference Target Claims

 William Simmons, Patrick McSpadden, the Clara Lacy Fentress Trust, and Arnold Schecht all voted against the plan. Each of these persons were among the limited partners of Arrowhead, Ltd. Prior to bankruptcy, ASK settled claims asserted by this partnership (and two others, Sunco, Ltd. and All American, Ltd.) against it by paying $30,000 in cash and assigning ASK's interest in a long term note from another partnership (JHA, Ltd.), valued at $209,777.00, to a trustee on behalf of Arrowhead's limited partners. The estate has

**36.** Solar Resources requested claims estimation for its claim under Section 502(c) shortly before the hearing. The request was granted and a hearing held for that purpose immediately preceding the confirmation hearing. Extended factual findings and legal conclusions were made at that hearing, resulting in a valuation of $1,039,000.00 for voting purposes. At the conclusion of the confirmation hearing, the court advised the parties that it had detected an error in its own method of computation which it intended to review and correct before deciding the confirmation issue. This opinion addresses that correction, but does not reproduce the remaining findings and conclusions made at the claims estimation hearing. Those findings and conclusions are ratified and adopted except as expressly modified and corrected by this decision.

since brought a preference action to recover the money paid under the settlement on grounds the settlement worked to partially pay an antecedent debt against the debtor within ninety days of the bankruptcy filing. This court has previously entered an interlocutory ruling that the settlement could indeed be a preference, but has not yet heard the balance of the trial relating to the defense that ASK was not insolvent at the time of the transfer. *See* 11 U.S.C. § 547(b)(3). These preference claimants now claim to hold a contingent claim against the estate. The debtor evidently felt differently and refused to count their ballots, in which each of the three rejected the plan.

▆▆ The targets of a preference action do not hold claims against the estate for voting purposes "unless such entity or transferee has paid the amount, or turned over such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title." 11 U.S.C. § 502(d); *In re Coral Petroleum, Inc.*, 60 B.R. 377 (Bankr.S.D.Tex.1986); *In re Southern Indust. Banking Corp.*, 66 B.R. 349, 361 (Bankr.E.D.Tenn.1986); *but see In re Amarex, Inc.*, 61 B.R. 301 (Bankr. W.D.Okla.1985). In *Coral Petroleum*, the court observed that, because claims arising from a preference are expressly disallowed under Section 502(d), and because only allowed claims may vote on a plan, the targets of actions to recover preferential transfers may participate in the balloting only after they have surrendered the preference to the estate. *In re Coral Petroleum, Inc., supra* at 382 (criticizing *Amarex'* reliance on equitable principles which contravene the express language of the statute). These parties have not yet surrendered the preference sought to be re-

covered by the debtor. They do not therefore hold allowed claims against the estate. Their votes must therefore be disregarded. 11 U.S.C. § 1126(a); Bankr.R. 3018.[37]

### 2. The Solar Resources Claim

▆▆ Solar Resources' claim is the target of an objection by ASK. ASK also asserts by counterclaim that Solar Resources owes ASK over $1.3 million on certain long term notes executed in connection with the same purchase agreement which forms the basis of Solar Resources' claims against the estate. Solar Resources' proof of claim alleges liability in excess of $2.2 million. Because the claim is subject to an objection, it is not deemed allowed under Section 502(a). 11 U.S.C. § 502(a) ("claim ... proof of which is filed under section 501 ... is deemed allowed, unless a party in interest ... objects"). Solar Resources properly sought and obtained a hearing to estimate its claim for voting purposes, consistent with Bankruptcy Rule 3018(a). Based on the evidence presented at that hearing, held immediately preceding the confirmation hearing, the court estimated the claim at $1,382,800, less an offset of $289,142.72, representing what the court then concluded was the present value of ASK's claim against Solar Resources by virtue of the long term notes.

During the confirmation hearing, the court realized that it had miscalculated the present value of ASK's offset, having failed to give effect to the fact that the long term notes accrue interest. After recomputing the present value of these notes taking this factor into account, the court now concludes that the offset of the Solar

---

**37.** Even if counted, their claims could not exceed the $285,324.00 which is the object of the preference action. The recovery of the preference would not reinstate the original claim against ASK compromised in the pre-petition settlement agreement. By recovering the preference, the debtor-in-possession is merely discharging a fiduciary duty to the unsecured creditor body to recover and preserve property of the estate. *See* 11 U.S.C. §§ 541(a)(4), 1107(a), 704(1), 551. It was not a party to the pre-petition settlement agreement—the debtor was—so

it is not the debtor reneging on the settlement agreement. Arrowhead held an antecedent claim against the estate which was partially paid by means of a settlement within ninety days of filing. The payment received is not conceptually distinguishable from any other negotiated transfer of property received by a creditor within the preference period. 11 U.S.C. § 547(b); *See In re Bob Grissett Golf Shoppes, Inc.*, 44 B.R. 156, 158 (Bankr.E.D.Va.1984); *Matter of Thrifty Supermarket, Inc.*, 6 B.C.D. 214, 215 (Bankr.S.D. Fla.1980).

Resources notes available to ASK is $1,328,603.00.[38] This leaves Solar Resources with a net estimated claim of $54,197.00.[39]

### 3. Methodology of Canvassing Votes

 At the confirmation hearing, the debtor presented its method for computing the vote of Class III claimants. Solar Resources launched a vigorous attack on the method employed, noting its inherent unreliability.[40] Upon conclusion of the hearing, the debtor (at the court's request) tendered the ballots to the court. The court has since reviewed every ballot filed, comparing each to the creditor's proof of claim, if one was filed, or to the debtor's schedules if one was not.[41] The method selected for canvassing the ballots was dic-

tated by the provisions of Sections 1126(a), 502, and 1111(a).

Section 1126(a) provides that "the holder of a claim ... allowed under Section 502 of this title may accept or reject a plan." 11 U.S.C. § 1126(a). Section 502(a) treats as "deemed allowed" all claims for which a proof of claim is filed and to which no objection has been filed. 11 U.S.C. § 502(a). If an objection is filed and resolved after notice and a hearing, then the claim is allowed as determined by the court. 11 U.S.C. § 502(b); *see* Bankr.R. 3018(a) (plan may be accepted or rejected by any creditor whose claim is deemed allowed pursuant to § 502 "or has been allowed by the court"). If there is no proof of claim on file, the claim may nonetheless be treated as though such a claim were on

38. The court had simply taken the face value of the notes, together with interest accrued to date, and discounted them back from their maturity date without considering any further interest which might continue to accrue under the terms of the notes between the hearing date and the date when the notes fell due (in 1994). Applying a discount factor of 6% to this gross sum ($1,328,603) yielded the offset figure announced at the claim estimation hearing. By the terms of the notes, however, the interest which continues to accrue is simply added to principal if not timely paid. Thus the total due upon maturity is $937,610 plus interest compounded monthly at 10%, or about $2,538,149.00. If the discount factor employed for present value analysis is the same as the interest rate of the notes, the present value of the notes is $1,328,603.00, or precisely what is currently due. The interest accruing offsets the discount factor. If a discount factor of 6% is employed, the present value of ASK's offset is *greater* ($1,720,142.00).

39. In estimating a claim, the bankruptcy court should use whatever method is best suited to the particular circumstances. Although the bankruptcy court is bound by the legal rules which govern the ultimate value of the claim, there are no other limitations on the court's authority to estimate claims.
3 *Collier on Bankruptcy*, para. 502.03 at p. 502–75 (15th ed. 1988); *see Matter of Brints Cotton Marketing, Inc.*, 737 F.2d 1338, 1341 (5th Cir. 1984). The "legal rules which govern the ultimate value of the claim" certainly include giving effect to an offset claim, whether asserted by way of recoupment or via a counterclaim. *In re Yonkers Hamilton Sanitarium, Inc.*, 34 B.R. 385, 387 (S.D.N.Y.1983); *In re Hamby*, 19 Bankr. 776, 783–84 (Bankr.N.D.Ala.1982).

40. The debtor purported to use a consistent tally scheme, under which it counted all votes re-

ceived in the class which its records reflected had claims against the estate. If a vote was submitted without being marked as either accepted or rejected, but did check off one of the two alternative recoveries offered under the plan, the debtor treated the ballot as an acceptance. For determining the dollar amount of claims, the debtor selected the larger of the amount inserted by the creditor in the blank provided on the ballot or the amount which the debtor's records reflected the creditor was owed. Apparently, no effort was made to coordinate ballots with filed proofs of claim or with the amounts set out in the debtor's schedules.

41. The court has exercised its prerogative to take judicial notice of its files in this proceeding, including the proofs of claim and the debtor's schedules. *See Matter of Williams*, 850 F.2d 250 (5th Cir.1988) (court has a mandatory independent duty to determine whether the plan has met all the requirements necessary for confirmation). In taking judicial notice of the proofs of claim filed by creditors and the debtor's schedules listing the amount of claims for which no proof of claim is on file, the court notes that the "deemed allowed" provisions of Section 1111(a) and Section 502(a) are thereby triggered. Whether the information contained in the schedules or proofs of claim is true is immaterial to this inquiry. *Cf.* Russell, *Bankruptcy Evidence Manual*, § 201.5 (West 1987). The existence of the proofs of claim and the presence in the schedules of amounts due to other claimants who have not filed proofs of claim is an adjudicative fact essential to the determination of how Class III voted in this case. Russell, *supra*, § 201.2; Fed.R.Evid., Rule 201(b). A court is permitted to take judicial notice at any stage of the proceeding, even at the appellate stage. Russell, *supra*, § 201.3; Fed.R.Evid., Rule 201(f).

file if it is listed in the debtor's schedules (unless it is listed as disputed, contingent or unliquidated). 11 U.S.C. § 1111(a). If the claim is either contingent or unliquidated, the court is required to estimate the claim for allowance purposes. 11 U.S.C. § 502(c); *but see* note 25 *supra.* If an objection has been filed, the court may estimate the claim for voting purposes. Bankr.R. 3018(a).

■ Following the foregoing principles, the court counted the ballots in Class III. Where a proof of claim was on file, that amount was used. If no proof of claim was on file, the court referred to the debtor's schedules, using the amount there indicated. If a claim had been compromised and settled by court order, the court (taking judicial notice of its files), used that amount to override what might otherwise be listed in the proof of claim or the debtor's schedules. *See* 11 U.S.C. § 502(b). The court disregarded the ballots of Brian Pardo for $207,377.72 and Pardo's wife's company, ESP Communications, for $73,753.24. Those ballots for which nothing in the files indicated the existence of a claim were tallied separately.[42] Only the Solar Resources claim required estimation, as discussed above. The tally is attached to this decision as an exhibit, with self-explanatory notes, and constitutes a finding of

this court in support of its conclusion that Class III overwhelmingly accepted the debtor's plan.[43]

## IV. THE PLAN (AS MODIFIED) IS FEASIBLE

Section 1129(a)(11) requires a finding that

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for future financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11). The plan as proposed prior to the modification could be tested for confirmation. However, if the modification proposed by the debtor at the behest of Western Federal is permissible, the feasibility issue will be substantially easier to resolve, because of the condition subsequent it proposes. We turn first, then, to the issue of modification.

### A. THE PLAN MAY BE MODIFIED

■ Western Federal objected to ASK's plan on feasibility grounds. The objection was resolved by a plan modification, which inserted a "drop dead" provision in the confirmation order. The provision set a

---

42. There *shall* be estimated for purpose of allowance under this section—
(1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case ...
11 U.S.C. § 502(c); *In re Nova Real Estate Investment Trust,* 23 B.R. 62, 65 (Bankr.E.D.Va. 1982). The House Report commenting on this new provision advised that

> Subsection (c) *requires* the estimation of *any* claim liquidation of which would unduly delay the administration of the estate, *such as* a contingent claim.... This subsection requires that *all claims* against the debtor be converted into dollar amounts.

H.R.Rep. No. 595, 95th Cong, 1st Sess 354 (1977), U.S.Code Cong. & Admin.News 1978, p. 6310. There is some doubt that the estimation process is intended to operate as a substitute for the allowance process of subsections (a) and (b). Rather, it seems that this subsection is a necessary *adjunct* to the allowance of claims, which in general include *both* liquidated *and* unliquidated claims. *See* 11 U.S.C. § 101(4). A claim

to be allowed for purposes of voting under Section 1126(a) or for distribution under Sections 726 or 1326 or Bankruptcy Rule 3021 must be reduced to a dollar amount, so subsection (c) is an essential attribute of allowance with respect to contingent claims. 3 *Collier on Bankruptcy,* para. 502.03 at p. 502–74 (15th ed. 1987). It is quite another matter to assume that subsection (c) *alone* can operate to render a contingent or unliquidated claim allowable when there is no proof of claim on file and the claim is not scheduled. For this reason, the court has separately tabulated such claims. The result of the tally is not changed if these votes are disregarded entirely.

43. It is worth noting that even were Solar Resources rejection allowed in the full amount established at the valuation hearing without any offset for the note to ASK, and even were Cardinal Investments claim treated as a Class III claim voting against the plan, the vote would still be in favor of the plan, by $3,362,802 to $1,616,949, satisfying Section 1126(c).

bar date for the plan's funding and for distribution to the unsecured creditors. According to the terms of the agreement, as this court understands it, the plan must be funded within sixty days after the entry of the confirmation order, and a partial distribution must be made to unsecured creditors in Class III within 90 days after the entry of the confirmation order.[44] If there is a default, the confirmation (and its attendant global discharge) would be revoked, without prejudice to the submission of another plan.

At the confirmation hearing, the court allowed the plan modification on the finding that the amendment does not adversely affect any plan participants. To the contrary, the modification enhances the plan's feasibility and is thereby beneficial for all claimants. A plan which relies on prospective funding is made the more feasible by the addition of a "drop dead" provision which sets a short and specific deadline for that funding as a condition subsequent.[45] The modification is not "material" in that creditors would not be likely to reconsider their affirmative vote as a result of this modification. Furthermore, because it does not adversely affect plan participants, the plan as modified will be deemed to have been accepted by those who accepted the plan pre-modification. *See* discussion *supra* at II.C.2.

## B. THE PLAN IS OTHERWISE FEASIBLE, BECAUSE IT WILL LEAVE THE COMPANY WITH SUFFICIENT WORKING CAPITAL TO DEVELOP ITS PROSPECTIVE BUSINESS IN THE DESICCANT ENERGY BUSINESS

The plan as modified is feasible. It is premised on the infusion of $7 million worth of new capital in exchange for 23% of the company's equity issue, the infusion to take place within thirty days of confirmation. Two potential suitors were identified at the hearing, Turner Properties and International Capital Trust. If either one of these "white knights" comes through with its promised investment, the company will have $1.5 million in cash immediately available to satisfy the Class III claims, another $700,000 available to pay the initial payment due the Class I claim of Western Federal under the plan, some $500,000 available for administrative expenses, and the balance available for working capital.

Even if James Alexander, the Class II claim, insists on his due under the plan, there would remain $4.3 million from which his monthly payments of $214,163 could be paid, until the $1.3 million claim was retired in about six months.[46] What is more likely, however (and what the evidence indicates) is that Alexander will convert a portion of his debt to equity, as contemplated in the disclosure statement. He already has a

---

**44.** The partial distribution would be made pro rata to those unsecured creditors holding uncontested claims, out of the funds set aside for the unsecured creditors under the plan. A pro rata portion of this fund would be escrowed by the debtor as a reserve for that portion of the total of unsecured claims which are contested. As these claims are litigated and resolved, they would be satisfied out of this reserve. To the extent that the contested claims are resolved for less than the amount asserted by the claimants, the excess in reserve would be available for redistribution to all creditors, increasing the percentage recovery to Class III claim holders. The pro rata amount reserved would be computed by adding up all contested claims in the amounts asserted, without offset, then computing the percentage of the total unsecured claims this amount represents.

**45.** *Cf. In re Nite Lite Inns,* 17 B.R. 367, 370 (Bankr.S.D.Cal.1982). In *Nite Lite,* the court

found feasible a plan which contemplated liquidation in the event the plan failed, since "such liquidation or reorganization is proposed in the plan." *Id.;* 11 U.S.C. § 1129(a)(11). A provision such as the one the debtor here proposes operates as a check against "visionary schemes which promise much more than can be realistically delivered" and therefore enhances the plan's feasibility. *In re Coastal Equities, Inc.,* 33 B.R. 898, 907 n. 10 (Bankr.S.D.Cal.1983).

**46.** Even if such a result obtained, the plan would have achieved more for creditors than they could expect to receive currently absent confirmation. All the inventory is encumbered by Alexander's post-petition lien, while the patent secures Western Federal's claim. On liquidation, Western Federal could well have a deficiency claim after quick sale of the patent, adding a potentially large claim to the unsecured creditor pool. Most importantly, the additional infusion of $7 million would not materialize.

lien on the inventory (said to be worth approximately $600,000) and allowing the company to put into place its technology increases his chances of a long-term recovery. The fact that Alexander has already lent ASK well over $1 million during the pendency of the case and yet has remained relatively passive throughout the case lends further credence to this scenario. Assuming Alexander (who evidently is responsible for bringing in one of the two white knights), opts to convert a portion of his debt to equity, the balance of his indebtedness would be paid off within three months of confirmation. Meanwhile, the debt to Western Federal which currently encumbers the patent ASK holds on its desiccant technology will be discharged shortly after confirmation, with Western Federal converted to an equity position. The patent technology thus held by ASK will inure to the benefit of those who have elected to take stock under the plan. With just slightly under $4 million available in working capital, the company will have as good an opportunity to take advantage of new markets as any other company in the field. Even if it does not succeed, the patent technology represents a valuable asset the sale, licensing, or even liquidation of which would again inure to the benefit of the company's stockholders.[47]

The company currently has $600,000 worth of inventory in place awaiting sale, plus a lending commitment for working capital from Ford Motor Credit for manufacture of the cogeneration equipment. ASK envisions generating an annual cash flow in excess of $4.5 million. Though there has been no activity in the market to date, the company has a past history of nationwide marketing (according to ASK's disclosure statement, it marketed through Sears, Roebuck & Co. and through the Tennessee Valley Authority prior to the drop in the cost of fossil fuels that helped to precipitate ASK's financial difficulties).

ASK's principal stated that he had been contacted by entities interested in the desiccant technology, indicating to him a strong market for the new product. The company's current moribund state of operations is due to lack of operating capital, a problem to be remedied if the plan is confirmed. With the infusion of new capital, the company should have little trouble covering the additional costs to add to its inventory or to cover the additional $8000 per/unit cost to market and install the units.

The current president is expected to retain his position managing the company. During his tenure, he has been able to attract business for the company, expand into national markets, and take the company public. During the pendency of this case, he has been able to attract post-petition financing and maintain their cooperation, to direct the development of a new technology, and to attract investment interest in a product yet to be fully marketed. His continuation as the debtor's principal seems to be on balance good for the company.

The plan does not depend on cash flow for debt service, but rather on the prospect that creditors will share in the new company's anticipated prosperity. This is an investment risk which Classes I, II, IV, and VI have elected to assume (none of these classes objected to confirmation and Class I changed its vote to an acceptance as indicated above). Class III claims are to be paid in cash or in stock, depending on claimholder's elections. The usual feasibility concerns associated with a debtor's ability to pay back its creditors over time out of operations is simply not present in this case. *Cf. In re Retzlaff,* 64 B.R. 137 (Bankr.N.D.Ia.1986); *In re Toy & Sports Warehouse, Inc.,* 37 B.R. 141 (Bankr.S.D. N.Y.1984).

In short, the proposed reorganization is feasible—not guaranteed, to be sure, but at least feasible. 5 *Collier on Bankruptcy,*

---

47. The only testimony received with respect to the patent indicated a value to the company of approximately $9 million. Even discounting this number for hyperbole, it would nonetheless be safe to say that the patent has substantial value (probably well in excess of $2 million), because of the interest ASK has been able to attract from third party investors. There is nothing else of any particular value in the company (so far as the court can discern) that justifies overtures of $7 million in cash.

para. 1129.02 at 1129–33 (15th ed. 1988); *In re Monnier Bros.*, 755 F.2d 1336, 1341 (8th Cir.1985) ("success need not be guaranteed").

Guaranteed success in the stiff winds of commerce without the protection of the Code is not the standard under § 1129(a)(11). Most debtors emerge from reorganization with a significant handicap.... [citations omitted] All that is required is that there be reasonable assurance of commercial vitality.

*In re Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr.S.D.N.Y.1986); *accord, In re Future Energy Corp.*, 83 B.R. 470, 503 (Bankr.S.D.Ohio 1988).

The touchstone of feasibility is whether or not the Debtor emerges from reorganization with reasonable prospects of financial stability and success, and in particular the ability to meet the requirements for capital expenses.

*In re Jartran, Inc.*, 44 B.R. 331, 393 (Bankr.N.D.Ill.1984). A court has no set list of factors which it can "check off" against the debtor's proposed plan. At best, the court makes an evaluation appropriate to the nature of the business, the economic climate in which the business is emerging, the peculiar requirements of the debtor's plan, and the market in which the business is intended to operate. Cases have highlighted such factors as the company's earning power, the adequacy of its capital structure and the availability of working capital, the necessity for and availability of credit, and the ability of management. *In re Prudential Energy Co., supra; In re Toy & Sports Warehouse Inc.*, 37 B.R. 141, 151 (Bankr.S.D.N.Y.1984); *Matter of Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr.D.N.J.1980). In this case, the nature of the plan is such that, even if the debtor's projections for future business prove to be entirely illusory, the participants will nonetheless be better off as a result of confirmation, because of the requisite infusion of new capital. The plan must therefore be pronounced a success even if the company itself were to fold in six months (assuming the worst).[48] The very fact that an investor is willing to put up $7 million for 23% of this company is in and of itself a strong indication of feasibility. The court concludes that the plan satisfies the requirements of Section 1129(a)(11).

### CONCLUSION

Based upon the foregoing, the court concludes that the debtor's plan satisfies the requirements of Section 1129(a) and may therefore be confirmed. This opinion constitutes the court's findings and conclusions with regard to the confirmation of the plan. A separate confirmation order will be entered.

### EXHIBIT A

| creditor | key | accept (amnt) | reject (amnt) |
| --- | --- | --- | --- |
| AAA Answerphone | ** | 81.25 | |
| Abbott MiniStor | ** | 485.00 | |
| ABC Fire Protect | ** | 102.40 | |
| ABF Freight | * | | 906.50 |
| Abke, Robert | * | | 5,574.48 |
| Advanced Solar | ** | 770.00 | |
| Adventure Travel | * | 1,766.00 | |
| AFG Indust | * | 30,402.61 | |
| Alco Standard Corp | * | 65.34 | |
| Allied Signal | *** | 26,500.00 | |
| Alumax | * | 87,701.37 | |
| Amer Appli | * | 16,999.75 | |
| Amer Stock Transfer | ** | 3,000.00 | |
| AMFAC Distrib | * | 23,266.36 | |
| Amtrol | ** | 9,915.36 | |

**48.** The evidence does not suggest that such a scenario is likely. It merely serves the best interests of the estate to contemplate such a possibility to better measure the plan's feasibility under the standard of Section 1129(a)(11).

| creditor | key | accept (amnt) | reject (amnt) |
|---|---|---|---|
| Anderson | ** | 500.00 | |
| APA Transport | * | 170.88 | |
| Arnold & Assoc | | 1,120.71 | |
| Atlas Enterp | ** | 286.34 | |
| Aurora Crane | ** | 284.60 | |
| Aurora Disposal | ** | 235.00 | |
| Averitt Express | ** | 2,664.94 | |
| A.J. Business Sup | ** | 153.69 | |
| B & B Janitorial | ** | 360.00 | |
| Bagley | * | 5,200.00 | |
| Bailey, Ed | * | 205.00 | |
| Bank, Sanford | ** | | 982.00 |
| Barnett Brass | ** | 2,936.01 | |
| Bates, Paul | * | 6,206.00 | |
| Beaver Bros | ** | 538.00 | |
| Beckett Corp | * | 93.75 | |
| Beemak Plastics | ** | 4,300.12 | |
| Bendix Transp Mgmnt | ** | 1,863.28 | |
| Benoit, John | ** | 483.30 | |
| Bland Electric | ** | 60.00 | |
| Blankenship, Robert | * | 52.00 | |
| Blanks, Jerry | ** | 100.00 | |
| Bock Water Heaters | * | 99,296.95 | |
| Bolden, Arvin | ** | 362.47 | |
| Bonnell Co. | * | 38,923.31 | |
| Bowman Transp | * | 9,107.10 | |
| Brennan Insulation | ** | 149.07 | |
| Business News Pub | ** | 24.00 | |
| Butts, Robt | * | 2,384.80 | |
| Byers, Ellen | * | 210.00 | |
| Cahn, Harold | ** | 700.00 | |
| Cancellierx, Robt | ** | 3,160.00 | |
| Carroll Travel | * | 2,250.00 | |
| Carr, Virgil | * | 165.00 | |
| Cen Tex Anal Eng | ** | 73.00 | |
| Central Florida Tele | ** | 45.00 | |
| Central Freight Li | ** | 2,220.81 | |
| Central Indus Supp | * | 27,825.88 | |
| Central Waste Cont | ** | 520.84 | |
| Cenval Leasing | * | 8,694.13 | |
| Chappell & Handy | ** | | 6,334.30 |
| Chattanooga Gas Co. | * | 498.85 | |
| Chem Waste Mngmt | * | 1,441.90 | |
| Christensen, O.D. | ** | 485.00 | |
| Churchill Truck | * | 1,121.30 | |
| City Publishing | * | 46.98 | |
| Clearwater Linen | ** | 548.27 | |
| Cline, J. Norris | ** | 50.00 | |
| Coellner, James | ** | | 48,086.53 |
| Commerc Eqmnt Leas | ** | 34,318.35 | |
| Conditionaire Co | ** | 906.31 | |
| Control Data | * | 518.42 | |
| Cooke, Larry | * | 394.00 | |
| Cooper, Darryl | ** | 100.00 | |
| Copy Supply Whse | ** | 400.78 | |
| Cortasie | ** | 18,099.18 | |
| Crick, Charles | ** | 248.00 | |
| Crocker, Robt | ** | 180.00 | |
| Curtis Bus Forms | ** | 64.70 | |
| Deco Products | * | 1,118.00 | |
| Dun & Bradstreet | * | 3,291.50 | |

| creditor | key | accept (amnt) | reject (amnt) |
|---|---|---|---|
| DuPuy Oxygen | ** | 1,168.21 | |
| Dwyer Instrum | ** | 658.17 | |
| D'Allesandro, James | ** | 845.00 | |
| Economics Press | ** | 62.39 | |
| Elkhart Products | * | 10,151.40 | |
| Elm Hill Investors | * | 12,097.40 | |
| Embassy Indust | * | 10,692.24 | |
| Empl Casualty | * | 185,474.90 | |
| Empl Nat Ins | * | 18,615.00 | |
| Empl Tex Lloyd | * | 20,429.70 | |
| Energy Inv Res | ** | 5,053.00 | |
| Engin Tech Applic | ** | 361.04 | |
| Englander Container | ** | 200.22 | |
| Environ Tectonics | * | 812.47 | |
| ESP Comm | ** | 44,265.49 | |
| Eubank Automot | ** | 164.37 | |
| Express Temps | ** | 32.98 | |
| F & M Janitorial | ** | 230.00 | |
| Flair Mfg | ** | 4,269.82 | |
| Fletchinger, Don | ** | 300.00 | |
| Fluorocarbon Co | ** | 2,250.96 | |
| Foley & Lardner | ** | 2,751.64 | |
| Foote Mineral | * | 527.00 | |
| Frane, Henry | | 205.00 | |
| Franklin, Ferdie | ** | 667.00 | |
| Freeborn Eqpmnt | ** | 216.04 | |
| Fuel Air Serv | ** | 1,937.00 | |
| Gaglio, Joan | ** | 25.00 | |
| Galtronics | ** | 6,821.69 | |
| Gartner Shulman | * | 1,432.50 | |
| Gilbert, Bobby | ** | 600.00 | |
| Greene Rubber | ** | 4,851.60 | |
| Greenfield Mfg | ** | 1,400.00 | |
| Greenstein, Logan | ** | 45,602.64 | |
| Greyhound Expos Serv | ** | | 72.79 |
| Hall & Evans | ** | 14,355.38 | |
| Hambrick, Doriss | ** | 10,122.29 | |
| Haught AC | ** | 2,000.00 | |
| Haynes & Fullenw | * | 59,373.02 | |
| Healer Office Sup | ** | 192.52 | |
| Henderlight, Wm | * | 150.00 | |
| Hill, Donald | * | 580.00 | |
| Hiter, Warren | * | 287.16 | |
| Hollifield, Mike | ** | 1,000.00 | |
| Honeywell | * | 5,265.12 | |
| Howard, James | ** | 75.00 | |
| Hulse, Richard | ** | 300.00 | |
| Independent Energy | * | 2,581.97 | |
| Industr Elect Rep | ** | 330.26 | |
| ITT Comm Fin | * | 4,644.29 | |
| Jarrell, Linda | * | 100.00 | |
| Jobfinder | ** | 47.20 | |
| Joiner, Wallace | * | 185.00 | |
| K & L Builders | ** | 1,870.00 | |
| Kaler Carner | ** | 10,074.00 | |
| Keeney Mfg | * | 1,090.20 | |
| Kelly Services | ** | 830.72 | |
| Kendrick Tire | ** | 978.00 | |
| Knear, James | * | 210.00 | |
| Kolodey & Thomas | * | 1,810.09 | |
| Laird, Mitchell P.C. | * | 482.23 | |

| creditor | key | accept (amnt) | reject (amnt) |
|---|---|---|---|
| Larry's Off Mach | ** | 102.18 | |
| LaSorsa, Mike | ** | 500.00 | |
| Letro Products | ** | 1,357.60 | |
| Lindsey, Kenneth | * | 5,211.25 | |
| Little Giant Pump | ** | 1,580.65 | |
| Lochridge–Priest | ** | 3,172.34 | |
| Long Island Lghtng | * | 4,141.55 | |
| Longhorn Gasket | * | 1,439.88 | |
| Loughridge Knives | ** | 565.05 | |
| Luffman, Debra | ** | 905.00 | |
| Lum, Chew Num | ** | 100.00 | |
| L.L. Sams & Sons | ** | | 9,752.31 |
| M & T Chem | ** | 5,150.00 | |
| MacFarlane Enterp | ** | 200.44 | |
| Mackie Bus Forms | ** | 127.32 | |
| MacLean, Robt | ** | 210.00 | |
| Manier Herod | * | 7,450.06 | |
| Marcy, Frank | * | 255.00 | |
| Mars Office Mach | ** | 67.50 | |
| Marshall, Chas | * | 21,000.00 | |
| Martens, Marvin | ** | 300.00 | |
| Maynard & Assoc | ** | 333.62 | |
| Mendenhall, Clarence | * | | 5,206.03 |
| Mercury Electric | ** | 174.36 | |
| Meredith, Clifford | ** | 750.00 | |
| Merkley, Leo | * | 4,995.00 | |
| Michigan Nat Bank | * | 400,000.00 | |
| MichroTech Res | ** | 155.08 | |
| Middlesex News | ** | 141.80 | |
| Mid–Tenn Supp | ** | 362.30 | |
| Milligan, Joseph | ** | 300.00 | |
| Moore, Richard | * | 4,261.23 | |
| Mueller Brass | * | 17,158.02 | |
| Naman Howell | ** | 246,315.09 | |
| Nat'l Gen Agncy | * | 17,411.63 | |
| Nelson, Clinton | ** | 300.00 | |
| Nielson, John | * | 35,000.00 | |
| NMC of North Am | ** | 9,824.00 | |
| Noland Co. | ** | 20.95 | |
| Noranda Metal Ind | * | 24,792.34 | |
| Nordson Corp | * | 3,834.17 | |
| Norgas | ** | 49.53 | |
| Northern & Nye | * | | 321.64 |
| NW Transp | ** | 73.88 | |
| Oakley, Richard | * | 408.60 | |
| Olmsted–Kirk Paper | ** | 166.25 | |
| Olsten Serv | ** | 314.00 | |
| Olympian Oil | ** | 108.50 | |
| Omni Pkg Dist | ** | 164.33 | |
| Osborne, Sylvia | * | 6,907.86 | |
| Pacific Bell | * | 1,049.05 | |
| Packet Facilities | ** | 1,157.05 | |
| Parman Oil | ** | | 1,577.85 |
| Parsons, Don | ** | 1,509.81 | |
| Patchogue Stat | ** | 1,019.64 | |
| Peters Trucking | ** | 130.00 | |
| Peters & Wms | ** | 623.97 | |
| Petrolane Gas Serv | * | | 1,745.13 |
| Philips Indust | ** | 10,566.45 | |

| creditor | key | accept (amnt) | reject (amnt) |
|---|---|---|---|
| Phillips, James | ** | 100.00 | |
| Piedmont Group | ** | 1,000.00 | |
| Pipeline Supply | ** | 5,625.00 | |
| Poellot, Joseph | ** | 300.00 | |
| Poss, Tara | ** | 300.00 | |
| Precision Air Prod | ** | 344.81 | |
| Prudential Ins | * | 20,425.46 | |
| Pruett, Chas | ** | 103.00 | |
| Pub Serv of Colo | ** | 1,975.38 | |
| Purvis Bearing | ** | 4,065.39 | |
| Pustejorsky, Joe | * | 1,181.25 | |
| Reavey, Wm | ** | 300.00 | |
| Reese, Lance | ** | 250.00 | |
| Republic Telecom | ** | 720.60 | |
| Revere St. Prop | ** | 9,469.34 | |
| Richards Eqpmnt | ** | 13,500.00 | |
| Rich, Al | ** | 1,754.50 | |
| RMax | * | 8,190.72 | |
| Roberts, Richard | * | | 5466.60 |
| Robinette, Lewis | ** | 1,000.00 | |
| Robinson, John | ** | 187.50 | |
| Rockwell Credit | * | 6,096.00 | |
| Roloff Mfg | * | 638.77 | |
| RReef USA Fund | * | 34,186.33 | |
| Rubatex Corp | * | 26,289.78 | |
| Ryerson & Son | * | 6,202.52 | |
| Sacramento Bee | ** | 290.60 | |
| Saunier–Duval | ** | 300.00 | |
| Schneeman & Assoc | ** | 6,430.68 | |
| Scott, Wm | ** | 250.00 | |
| Seagroves, Chas | * | 3,500.00 | |
| Sears Roebuck | ** | 435,678.25 | |
| Severance, Wayne | ** | 500.00 | |
| Shortbridge, Ernest | ** | 1,931.20 | |
| Shrader, Don | ** | 1,038.38 | |
| Sigma Telecom | ** | 171.80 | |
| Solar Ener Con | ** | 100.00 | |
| Solar Energy Ind | * | 55,000.00 | |
| Solar Resources | | | 54,197.00 |
| SOS Prod | ** | 112.48 | |
| Southern Bell | * | 3,442.36 | |
| Southwest Forest | * | 24,338.31 | |
| Southwest Pipe | ** | 5,794.74 | |
| Specialty Chem | ** | 387.23 | |
| State Carpet | ** | 150.00 | |
| Steel City Crane | ** | 822.40 | |
| Stone Container | * | 36,772.13 | |
| Strataflo Prod | ** | 3,155.25 | |
| Sun Image Solar | ** | 427.16 | |
| Sundstra Heat | * | 22,123.52 | |
| Sunshine Plus | * | 31,788.22 | |
| Sunshine Travel | ** | 864.00 | |
| SW Bell | * | 6,684.30 | |
| SW Silicone | ** | 1,416.00 | |
| Technical Maint | ** | 182.33 | |
| TemTex | ** | 745.00 | |
| Tex Empl Ins | * | 2,573.34 | |

| creditor | key | accept (amnt) | reject (amnt) |
|---|---|---|---|
| Texas Aero | * | 16,101.35 | |
| Texas Fitting Spec | ** | 23,399.35 | |
| Texas Time Rec | ** | 94.71 | |
| Texas Urethanes | | 9,700.00 | |
| Thaete, Edw | * | 430.00 | |
| Thilmany Pulp | ** | 5,229.82 | |
| Thompson & Assoc | ** | 8,321.90 | |
| Thompson, Michael | * | 14,428.00 | |
| Thorpe Insul | * | 38.10 | |
| Tin Bender | ** | 470.00 | |
| Titsworth, Rich | * | 210.00 | |
| TMC of Nashville | ** | 5.87 | |
| TMC of Orlando | ** | | 123.67 |
| TMC of Piedmont | * | 1,661.02 | |
| TMC (TriTel) | * | 628.48 | |
| Todd, John | | 3,300.00 | |
| Trew Assoc | ** | 4,287.52 | |
| Tropical Paradise | ** | 556.76 | |
| Truck & Trailer Eqpmnt | ** | 903.62 | |
| Tull Indus | * | 36,105.84 | |
| United Sanit | ** | 45.90 | |
| Vali Assoc | ** | 1,413.03 | |
| Vallance, Jas | * | 200.00 | |
| Valley Motel | ** | 2,619.12 | |
| Vaughn Mfg | *** | 37,932.26 | |
| Village Supply | ** | 50.00 | |
| Waco Auto Color | ** | 435.64 | |
| Waco Ct Rptrs | ** | 481.30 | |
| Waco Water Dept | * | 1,004.47 | |
| Wallace, Fisher | | 16,060.00 | |
| Warren Co. | ** | 2,872.00 | |
| Warren, Michael | ** | 340.00 | |
| Washington PhotoC | ** | 248.27 | |
| Waters, Vern | ** | 500.00 | |
| Watson Elect | * | 31,563.50 | |
| Weber, Eldon | * | 19,940.00 | |
| Western Exch | ** | 219.35 | |
| Western Fed S & L | *** | 441,000.00 | |
| White Twinstack | ** | 838.24 | |
| Whitley, Pat | ** | 120.00 | |
| Wilkerson, Bernard | * | 470.00 | |
| Wilson Tool | * | 1,416.61 | |
| Windsor Public | ** | 4,000.00 | |
| Witco Allied Kelite | ** | 5,851.85 | |
| Woods, Bernard | ** | 805.00 | |
| Xerox Corp | * | 38,057.69 | |
| Zenith Cutter | ** | 136.11 | |
| | | | |
| subtotal | | 3,362,802.32 | 140,346.83 |

* Proof of claim on file for amount indicated

** no proof of claim, but scheduled in amount shown

*** claim scheduled or proof of claim for more, but compromised to amount shown

[no asterisk] claim estimated by court for plan purposes