# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

January 17, 2019

Lyle W. Cayce
Clerk

————

No. 17-20793

————

In re: ULTRA PETROLEUM CORPORATION; KEYSTONE GAS GATHERING, L.L.C.; ULTRA RESOURCES, INCORPORATED; ULTRA WYOMING, INCORPORATED; ULTRA WYOMING LGS, INCORPORATED; UP ENERGY CORPORATION; UPL PINEDALE, L.L.C.; UPL THREE RIVERS HOLDINGS, L.L.C.,

      Debtors,

ULTRA PETROLEUM CORPORATION; KEYSTONE GAS GATHERING, L.L.C.; ULTRA RESOURCES, INCORPORATED; ULTRA WYOMING, INCORPORATED; ULTRA WYOMING LGS, INCORPORATED; UP ENERGY CORPORATION; UPL PINEDALE, L.L.C.; UPL THREE RIVERS HOLDINGS, L.L.C.,

      Appellants,

v.

AD HOC COMMITTEE OF UNSECURED CREDITORS OF ULTRA RESOURCES, INCORPORATED; OPCO NOTEHOLDERS,

      Appellees.

————

Appeal from the United States Bankruptcy Court
for the Southern District of Texas

————

Before DAVIS, ENGELHARDT, and OLDHAM, Circuit Judges.

ANDREW S. OLDHAM, Circuit Judge:

No. 17-20793

These bankruptcy proceedings arise from exceedingly anomalous facts. The debtors entered bankruptcy insolvent and now are solvent. That alone makes them rare. But second, the debtors accomplished their unlikely feat by virtue of a lottery-like rise in commodity prices. The combination of these anomalies makes these debtors as rare as the proverbial rich man who manages to enter the Kingdom of Heaven.

The key legal question before us is whether the rich man's creditors are "impaired" by a plan that paid them everything allowed by the Bankruptcy Code. The bankruptcy court said yes. In that court's view, a plan impairs a creditor if it refuses to pay an amount the Bankruptcy Code independently disallows. In reaching that conclusion, the bankruptcy court split from the only court of appeals to address the question, every reported bankruptcy court decision on the question, and the leading treatise discussing the question. We reverse and follow the monolithic mountain of authority holding the Code—not the reorganization plan—defines and limits the claim in these circumstances.

Because the bankruptcy court saw things differently, it ordered the debtors to pay certain creditors a contractual Make-Whole Amount and post-petition interest at a contractual default rate. We vacate and remand those determinations for reconsideration.

I.

Ultra Petroleum Corporation ("Petroleum") is an oil and gas exploration and production company. To be more precise, it's a holding company. Petroleum's subsidiaries—UP Energy Corporation ("Energy") and Ultra Resources, Inc. ("Resources")—do the exploring and producing. Resources took on debt to finance its operations. Between 2008 and 2010, Resources issued unsecured notes worth $1.46 billion to various noteholders. And in 2011, it borrowed another $999 million under a Revolving Credit Facility. Petroleum and Energy guaranteed both debt obligations.

No. 17-20793

In 2014, crude oil cost well over $100 per barrel. But then Petroleum's fate took a sharp turn for the worse. Only a year and a half later, a barrel cost less than $30. The world was flooded with oil; Petroleum and its subsidiaries were flooded with debt. On April 29, 2016, the companies voluntarily petitioned for reorganization under Chapter 11. *See* 11 U.S.C. § 301(a). No one argues the companies filed those petitions in bad faith. *See id.* § 1112(b).

During bankruptcy proceedings, however, oil prices rose. Crude oil approached $80 per barrel, and the Petroleum companies became solvent again. So, the debtors proposed a rare creature in bankruptcy—a reorganization plan that (they said) would compensate the creditors in full. As to creditors with claims under the Note Agreement and Revolving Credit Facility (together, the "Class 4 Creditors"), the debtors would pay three sums: the outstanding principal on those obligations, pre-petition interest at a rate of 0.1%, and post-petition interest at the federal judgment rate. *In re Ultra Petroleum Corp.*, No. 4:16-bk-32202, ECF No. 1308-1 at 25–26 (Bankr. S.D. Tex. 2017). Accordingly, the debtors elected to treat the Class 4 Creditors as "unimpaired." Therefore, they could not object to the plan. 11 U.S.C. § 1126(f).

The Class 4 Creditors objected just the same. They insisted their claims *were* impaired because the plan did not require the debtors to pay a contractual Make-Whole Amount and additional post-petition interest at contractual default rates.

Under the Note Agreement, prepayment of the notes triggers the Make-Whole Amount. That amount is designed "to provide compensation for the deprivation of" a noteholder's "right to maintain its investment in the Notes free from repayment." A formula defines the Make-Whole Amount as the amount by which "the Discounted Value of the Remaining Scheduled Payments with respect to the Called Principal" exceeds the notes' "Called Principal." Remaining scheduled payments include "all payments of [the]

3

No. 17-20793

Called Principal and interest . . . that would be due" after prepayment (if the notes had never been prepaid). And the discounted value of those payments is keyed to a "Reinvestment Yield" of 0.5% over the total anticipated return on comparable U.S. Treasury obligations.

Under the Note Agreement, petitioning for bankruptcy automatically renders the outstanding principal, any accrued interest, and the Make-Whole Amount "immediately due and payable." Failure to pay immediately triggers interest at a default rate of either 2% above the normal rate set for the note at issue or 2% above J.P. Morgan's publicly announced prime rate, whichever is greater.

The Revolving Credit Facility does not contain a make-whole provision. But it does contain a similar acceleration clause that made the outstanding principal and any accrued interest "automatically . . . due and payable" as soon as Resources petitioned for bankruptcy. And it likewise provides for interest at a contractual default rate—2% above "the rate otherwise applicable to [the] Loan"—if Resources delayed paying the accelerated amount.

Under these two agreements, the creditors argued the debtors owed them an additional $387 million—$201 million as the Make-Whole Amount and $186 million[1] in post-petition interest. Both sides chose to kick the can down the road. Rather than force resolution of the impairment issue at the plan-confirmation stage, the parties stipulated the bankruptcy court could resolve the dispute by deeming the creditors unimpaired and confirming the proposed plan. Meanwhile, the debtors would set aside $400 million to

---

[1] This amount includes $106 million in interest on the outstanding principal under the notes, $14 million in interest on the Make-Whole Amount, and $66 million in interest on the outstanding principal under the Revolving Credit Facility, all accruing after the debtors filed their petitions.

compensate the Class 4 Creditors if necessary "to render [the creditors] Unimpaired." The bankruptcy court agreed and confirmed the plan.

After confirmation, the parties (and the bankruptcy court) turned back to the question of impairment. The debtors acknowledged the plan did not pay the Make-Whole Amount or provide post-petition interest at the contractual default rates. But they insisted the Class 4 Creditors were not "impaired" because federal (and state) law barred them from recovering the Make-Whole Amount and entitled them to receive post-petition interest only at the federal judgment rate.

The Bankruptcy Code provides that a class of claims is not impaired if "the [reorganization] plan . . . leaves unaltered the legal, equitable, and contractual rights to which such claim . . . entitles the holder." 11 U.S.C. § 1124(1). Elsewhere the Code states that a court should disallow a claim "to the extent that [it seeks] unmatured interest." *Id.* § 502(b)(2). The debtors argued the Make-Whole Amount qualified as unmatured interest. But even if it didn't, they said, it was an unenforceable liquidated damages provision under New York law. In either case, something *other than* the reorganization plan itself—the Bankruptcy Code or New York contract law—prevented the Class 4 Creditors from recovering the disputed amounts.

The debtors' argument as to post-petition interest was much the same: The Bankruptcy Code entitles creditors, at most, to post-petition interest at the "legal rate," not the rates set by contract. 11 U.S.C. § 726(a)(5). And the legal rate, they said, is the federal judgment rate under 28 U.S.C. § 1961. Once again, the Code—not the plan—limited the Class 4 Creditors' claims.

The bankruptcy court rejected the premise that it must bake in the Code's provisions before asking whether a claim is impaired. Instead it concluded unimpairment "requires that [creditors] receive all that they are entitled to under state law." *In re Ultra Petroleum Corp.*, 575 B.R. 361, 372

No. 17-20793

(Bankr. S.D. Tex. 2017).  In other words, if a plan does not provide the creditor with all it would receive under state law, the creditor is impaired even if the Code disallows something state law would otherwise provide outside of bankruptcy.  So, the bankruptcy court asked only whether New York law permits the Class 4 Creditors to recover the Make-Whole Amount (concluding it does), and whether the Code limits the contractual post-petition interest rates (concluding it does not).  *Id.* at 368–75.  It never decided whether the Code disallows the Make-Whole Amount as "unmatured interest" under § 502(b)(2) or what § 726(a)(5)'s "legal rate" of interest means.  It ordered the debtors to pay the Make-Whole Amount and post-petition interest at the contractual rates to make the Class 4 Creditors truly unimpaired.

The debtors sought a direct appeal to this Court (rather than the district court) because the case raises important and unsettled questions of law.  *See* 28 U.S.C. § 158(d)(2)(A).  The bankruptcy court agreed, and so did we.  *In re Ultra Petroleum Corp.*, No. 16-32202, 2017 WL 4863015, at *1 (Bankr. S.D. Tex. Oct. 26, 2017).  On appeal, we review those legal questions anew.  *In re Positive Health Mgmt.*, 769 F.3d 899, 903 (5th Cir. 2014).

## II.

We consider first whether a creditor is "impaired" by a reorganization plan simply because it incorporates the Code's disallowance provisions.  We think not.

## A.

Chapter 11 lays out a framework for proposing and confirming a reorganization plan.  Confirmation of the plan "discharges the debtor from any debt that arose before the date of such confirmation."  11 U.S.C. § 1141(d)(1).  Because discharge affects a creditor's rights, the Code generally requires a debtor to vie for the creditor's vote first.  *Id.* § 1129(a)(8).  And when it does, the creditor may vote to accept or reject the plan.  *Id.* § 1126(a).  But the

6

creditor's right to vote disappears when the plan doesn't actually affect his rights. If the creditor is "not impaired under [the] plan," he is "conclusively presumed to have accepted" it. *Id.* § 1126(f). The question, then, is whether the Class 4 Creditors were "impaired" by the plan.

Let's start with the statutory text. Section 1124(1) says "a class of claims or interests" is not impaired if "the plan . . . leaves unaltered the [claimant's] legal, equitable, and contractual rights." The Class 4 Creditors spill ample ink arguing their rights have been altered. But that's both undisputed and insufficient. The plain text of § 1124(1) requires that "the plan" do the altering. We therefore hold a creditor is impaired under § 1124(1) only if "*the plan*" itself alters a claimant's "legal, equitable, [or] contractual rights."

The only court of appeals to address the question took the same approach. In *In re PPI Enterprises (U.S.), Inc.*, a landlord (creditor) argued the reorganization plan of his former tenant (debtor) impaired his claim because it did not pay him the full $4.7 million of rent he was owed over the life of the lease. 324 F.3d 197, 201–02 (3d Cir. 2003). The Third Circuit disagreed. Because the Bankruptcy Code caps lease-termination damages under § 502(b)(6), the plan merely reflected the *Code's* disallowance. *Id.* at 204. At the end of the day, "a creditor's claim outside of bankruptcy is not the relevant barometer for impairment; we must examine whether the plan itself is a source of limitation on a creditor's legal, equitable, or contractual rights." *Ibid.* It simply did not matter the landlord "might have received considerably more if he had recovered on his leasehold claims before [the debtor] filed for bankruptcy." *Id.* at 205. The debtor's plan gave the landlord everything the law entitled him to once bankruptcy began, so he was unimpaired.

Decisions from bankruptcy courts across the country all run in the same direction. *See, e.g.*, *In re Tree of Life Church*, 522 B.R. 849, 861–62 (Bankr. D.S.C. 2015); *In re RAMZ Real Estate Co.*, 510 B.R. 712, 717 (Bankr. S.D.N.Y.

No. 17-20793

2014); *In re K Lunde, LLC*, 513 B.R. 587, 595–96 (Bankr. D. Colo. 2014); *In re Mirant Corp.*, No. 03-46590, 2005 WL 6440372, at *3 (Bankr. N.D. Tex. May 24, 2005); *In re Coram Healthcare Corp.*, 315 B.R. 321, 351 (Bankr. D. Del. 2004); *In re Monclova Care Ctr., Inc.*, 254 B.R. 167, 177 (Bankr. N.D. Ohio 2000), *rev'd on other grounds*, 266 B.R. 792 (N.D. Ohio 2001); *In re Am. Solar King Corp.*, 90 B.R. 808, 819–22 (Bankr. W.D. Tex. 1988). All agree that "[i]mpairment results from what the *plan* does, not what the [bankruptcy] statute does." *Solar King*, 90 B.R. at 819.

The creditors cannot point to a single decision that suggests otherwise. That's presumably why Collier's treatise states the point in unequivocal terms: "Alteration of Rights by the Code Is Not Impairment under Section 1124(1)." 7 COLLIER ON BANKRUPTCY ¶ 1124.03[6] (16th ed. 2018). "We are always chary to create a circuit split." *United States v. Graves*, 908 F.3d 137, 142 (5th Cir. 2018) (quotation omitted). That's especially true "in the context of bankruptcy, where uniformity is sufficiently important that our Constitution authorizes Congress to establish 'uniform laws on the subject of bankruptcies throughout the United States.'" *In re Marciano*, 708 F.3d 1123, 1135 (9th Cir. 2013) (Ikuta, J., dissenting) (quoting U.S. CONST. art. I, § 8, cl. 4). We refuse to create one today.

## B.

The Class 4 Creditors' counterarguments do not move the needle. First, they focus on § 1124(1)'s use of the word "claim." They note the Code elsewhere speaks of "*allowed* claims." *See, e.g.*, 11 U.S.C. §§ 506(a)(1), 506(a)(2), 510(c)(1), 1126(c). Then they suggest the absence of "allowed" in § 1124(1) means "claim" there refers to the claim *before* the Code's disallowance provisions come in and trim its edges.

But the broader statutory context cuts the other way. Section 1124 is not just (or even primarily) about the allowance of claims. It is about rights—

the "legal, equitable, and contractual rights to which [the] claim . . . entitles the holder." *Id.* § 1124(1). That means we judge impairment after considering everything that defines the scope of the right or entitlement—such as a contract's language or state law. *See In re Energy Future Holdings Corp.*, 540 B.R. 109, 121 (Bankr. D. Del. 2015); 11 U.S.C. § 502(b)(1). Even the bankruptcy court recognized this to some extent because it asked whether New York law permitted the Noteholders to recover the Make-Whole Amount. *See Ultra Petroleum*, 575 B.R. at 368–72. "The Bankruptcy Code itself is a statute which, like other statutes, helps to define the legal rights of persons." *Solar King*, 90 B.R. at 819–20.

Finding no help in § 1124(1)'s statutory text, the Class 4 Creditors turn to the legislative history of a different provision. In 1994, Congress repealed § 1124(3), which provided that a creditor's claim was not impaired if the plan paid "the *allowed amount* of such claim." 11 U.S.C. § 1124(3) (1988) (emphasis added). This proves, they say, that disallowance should now play no role in the impairment analysis.

Even for those who think legislative history can be relevant to statutory interpretation, this particular history is not. It does not say that every disallowance causes impairment. Rather, Congress repealed § 1124(3) in response to a specific bankruptcy court decision. *See In re New Valley Corp.*, 168 B.R. 73 (Bankr. D.N.J. 1994). That decision held unsecured creditors who received their allowed claims from a solvent debtor, but who did not receive post-petition interest, were unimpaired. *Id.* at 77–80. In debating the proposed repeal of § 1124(3), the House Judiciary Committee singled out *New Valley* by name as the justification for the repeal. *See* H.R. Rep. No. 103-835, at 47–48 (1994) (citing *New Valley* and explaining the intent to repeal § 1124(3) "to preclude th[e] unfair result" of "den[ying] the right to receive post petition interest"). It is noteworthy the committee report does not cite other

bankruptcy cases—such as *Solar King*—that addressed Code impairment under § 1124(1). That is why the Third Circuit rejected appellees' legislative-history argument in *PPI* and held the repeal of § 1124(3) "does not reflect a sweeping intent by Congress to give impaired status to creditors more freely outside the postpetition interest context." 324 F.3d at 207 (noting the committee report cited *New Valley* but not *Solar King*).

Next, the Class 4 Creditors attempt to distinguish *PPI*. True, that case involved disallowance under § 502(b)(6), not § 502(b)(2). But that's a distinction without a difference. *See In re W.R. Grace & Co.*, 475 B.R. 34, 161–62 (Bankr. D. Del. 2012); *Energy Future*, 540 B.R. at 122. Section 502 states that "the court . . . *shall allow* [a] claim in [the requested] amount, *except to the extent that*" any one of nine conditions apply. If any of the enumerated conditions applies, the court shall not allow the relevant portion of the claim. *PPI* reasoned that where one of those conditions applies, the Code—not the plan—impairs the creditors' claims. *See* 324 F.3d at 204. That reasoning applies with equal force to § 502(b)(2).

The Class 4 Creditors (like the bankruptcy court) also point to the mechanics of Chapter 11 discharge to suggest the plan itself, not the Code, is doing the impairing. They note the Code's disallowance provisions are carried into effect only if the plan is confirmed, and "confirmation of the plan . . . discharges the debtor from any debt that arose before" confirmation. 11 U.S.C. § 1141(d). In one sense, plan confirmation limits creditors' claims for money by discharging underlying debts. But in another sense, the Code limits the creditors' claims for money and imposes substantive and procedural requirements for plan confirmation. The Class 4 Creditors' argument thus begs the critical question: What is doing the work here? We agree with *PPI*, every reported decision identified by either party, and Collier's treatise. Where

No. 17-20793

a plan refuses to pay funds disallowed by the Code, the Code—not the plan—is doing the impairing.

## III.

That leaves the question whether the Code disallows the creditors' claims for the Make-Whole Amount and post-petition interest at the contractual default rates specified in the Note Agreement and the Revolving Credit Facility. The bankruptcy court never reached either question. The parties nevertheless urge us to reach them now. The creditors say their contracts entitle them to both amounts, and that their contracts should be honored under bankruptcy law's longstanding "solvent-debtor" exception. The debtors argue no such exception exists in modern bankruptcy law. And the debtors further argue both claims are governed by the Bankruptcy Code, not the pre-Code law or the parties' contracts.

A word of clarification at the outset regarding terminology: For almost three hundred years, bankruptcy law has recognized different kinds of "post-petition interest." As relevant here, the first is part of an underlying debt obligation—like the rate specified in the Note Agreement (i.e., interest *as part of* a claim). Although such interest has a life before bankruptcy, it may continue to exist and accrue from when the debtor files a bankruptcy petition until the day he finally pays the underlying debt. The second is interest a creditor is entitled to recover as a consequence of receiving a bankruptcy award (i.e., interest *on* a claim). That interest never existed before bankruptcy; rather, it arises only after bankruptcy has transmogrified a debt obligation into a bankruptcy award. Both types of interest are "post-petition" in that they accrue after the petition is filed. But the parties use the phrase "post-petition interest" to refer exclusively to the latter type of interest. Unless otherwise indicated below, so do we.

11

No. 17-20793

With that understanding, we first consider the historical, pre-Code provenance of the solvent-debtor exception. Second, we consider the proper interpretation of the Code. Finally, we vacate and remand both questions to the bankruptcy court.

A.

In eighteenth-century England, only a creditor could kick-start bankruptcy proceedings by submitting a petition and an affidavit to the Lord Chancellor. (There was nothing like our voluntary debtor petition under Chapter 11. *See* 11 U.S.C. § 301; Bankruptcy Act of 1841, ch. 9, § 1, 5 Stat. 440, 441 (1841) (repealed 1843).) The Lord Chancellor, in turn, granted a commission to "wyse and honest discrete p[er]sons," who were tasked with administering the bankrupt's estate. An Acte Touchyng Orders for Bankruptes 1571, 13 Eliz. c. 7, § 2; *see generally The Case of Bankrupts* (1589), 76 Eng. Rep. 441; 2 Co. Rep. 25a (K.B.).[2] Although English bankruptcy law mollified (somewhat) the severity of the Romans,[3] it authorized the commissioners "to breake open the [bankrupt's] House" to seize him and all of

_____

[2] Because the Lord Chancellor appointed commissioners promptly upon determining the debtor qualified as a bankrupt, the commission marked the beginning of bankruptcy proceedings. *See* Stephen J. Lubben, *A New Understanding of the Bankruptcy Clause*, 64 CASE WESTERN RES. L. REV. 319, 331–32 (2013); Louis Edward Levinthal, Note, *The Early History of English Bankruptcy*, 67 U. PENN. L. REV. 1, 17 (1919). For that reason, the commission date is functionally equivalent to the petition date under our present bankruptcy laws.

[3] As England's foremost jurist once said, we "like not Lawes written in bloode." Edward Coke, Speech in the House of Commons (May 24, 1621), *in* 5 COMMONS DEBATES, 1621, at 176 (Wallace Notestein et al. eds., 1935). *Compare* LEGES DUODECIM TABULARUM tbl. III, law X *in* 1 S.P. SCOTT, THE CIVIL LAW 64 (2001) ("Where a party is delivered up to several persons, on account of a debt, after he has been exposed in the Forum on three market days, they shall be permitted to divide their debtor into different parts, if they desire to do so."), *with* An Acte for the Discripcion of a Banckrupt and Reliefe of Credytors 1623, 21 Jac. c. 19, § 6 (A bankrupt may be "sett upon the Pillory in some publique Place, for the space of Two Houres, and have one of his or her Eares nayled to the Pillory and cutt off."); *but see* An Act to Prevent Frauds Frequently Committed by Bankrupts 1705, 4 & 5 Ann. c. 4, § 1 (authorizing punishment of death without the benefit of clergy for certain bankrupts).

his goods.  An Acte for the Discripcion of a Banckrupt and Reliefe of Credytors 1623, 21 Jac. c. 19, § 7; *see* 2 WILLIAM BLACKSTONE, COMMENTARIES \*479–80.

Several debtor-friendly rules softened things.  Of critical importance, English law barred creditors from recovering any interest that accrued after the Lord Chancellor issued his commission.  *Sexton v. Dreyfus*, 219 U.S. 339, 344 (1911).  Although the bankrupt was liable for interest up to the commission date, if bankruptcy proceedings dragged on, he was not liable for interest accruing as a result of the delay those proceedings caused before the commissioners actually paid his creditors.  *See Ex Parte Bennet* (1743), 26 Eng. Rep. 716, 717; 2 Atk. 527, 528 (Ch.); 1 WILLIAM COOKE, THE BANKRUPT LAWS 196–97 (6th ed. 1812) (citing *Ex Parte Wardell* (1787)).  And after paying his creditors in full, the bankrupt could recover any surplus left in his estate.  *See* An Acte for the Better Reliefe of the Creditors Againste Suche as Shall Become Bankrupts 1603, 1 Jac. c. 15, § 10; 13 Eliz. c. 7, § 4.

But there were exceptions to these rules.  For example, where a secured creditor held collateral that produced interest during bankruptcy proceedings, he could recover that interest after the commission date.  *See Ex Parte Ramsbottom* (1835), *in* 2 BASIL MONTAGU & SCROPE AYRTON, REPORTS OF CASES IN BANKRUPTCY 79, 83–84 (1836); *cf. Sexton*, 219 U.S. at 346.  The oversecured-creditor rule was another example.  Where a secured creditor held collateral that exceeded the value of the underlying debt, he could recover post-petition interest up to the value of his security.  That is, a creditor with collateral valued at $500,000 to secure an underlying debt for $400,000 would be able to recover interest up to $100,000.  *See Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 164 (1946); *but see United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 246 (1989) (observing this oversecured-creditor exception was "of more doubtful provenance").

Most importantly for our purposes, however, English bankruptcy law carved out an exception for solvent debtors. "In case of a surplus coming to a Bankrupt, Creditors have a right to interest wherever there is a contract for it appearing, either on the face of the security or by evidence." 1 COOKE, *supra*, at 198; 2 WILLIAM BLACKSTONE, COMMENTARIES *488. So, in 1743, the Lord Chancellor awarded "subsequent interest" to Stephen Evance's creditors because his estate was "able to pay it." *Bromley v. Goodere* (1743), 26 Eng. Rep. 49, 50–52; 1 Atk. 75, 77–80 (Ch.). Where the bankrupt's estate was solvent, the Lord Chancellor reasoned, awarding post-commission interest to some creditors would not prevent other creditors from receiving their "rateable portion." *Ibid.*; *see also Ex Parte Rooke* (1753), 26 Eng. Rep. 156, 157; 1 Atk. 244, 245 (Ch.).

But the fact the bankrupt's estate contained sufficient funds to pay creditors post-commission interest did not create a free-standing right to recover interest accruing throughout bankruptcy and up to payment. *Ex Parte Marlar* (1746), 26 Eng. Rep. 97, 98; 1 Atk. 150, 151 (Ch.). The solvent-debtor exception simply allowed any interest to *continue* accruing (at the contractual rate) if the creditor's contract already provided for interest on the underlying debt. *See Ex Parte Mills* (1793), 30 Eng. Rep. 640, 644; 2 Ves. jun. 295, 303 (Ch.); *accord Nicholas v. United States*, 384 U.S. 678, 682 n.9 (1966). Thus, English law conceived of post-commission interest as part and parcel of the underlying debt obligation, not something external to the obligation that the creditor received as a consequence of recovering from the bankrupt's estate. In other words, the solvent-debtor exception permitted interest that was *part of* a creditor's claim, not interest *on* a claim.

American bankruptcy law is codified against this background. The Constitution authorizes Congress "[t]o establish . . . uniform Laws on the subject of Bankruptcies throughout the United States." U.S. CONST. art. I, § 8,

cl. 4. When Congress first exercised that power to adopt permanent federal bankruptcy legislation in 1898, it borrowed extensively from this English history. *See* Bankruptcy Act of 1898, ch. 541, 30 Stat. 544, *repealed by* Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549; *cf.* THOMAS COOPER, THE BANKRUPT LAW OF AMERICA, COMPARED WITH THE BANKRUPT LAW OF ENGLAND (1801) (noting earlier American law, on which the 1898 Act was based, closely tracked English bankruptcy law). Ever since, "we [have] naturally assume[d] that the fundamental principles upon which [England's bankruptcy system] was administered were adopted by us when we copied th[at] system." *Sexton*, 219 U.S. at 344. That includes the fundamental principle barring creditors from recovering interest accruing after the petition (or commission) date—and the exceptions to that principle. *See Am. Iron & Steel Mfg. Co. v. Seaboard Air Line Ry.*, 233 U.S. 261, 266–67 (1914).

B.

In 1978, Congress enacted an entirely new Bankruptcy Code. *See* Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549 (codified as amended at 11 U.S.C. §§ 101–1532). The Code adopted many of these early bankruptcy principles, but with some important modifications.

For starters, Congress codified the general rule barring post-petition interest that is *part of* a creditor's claim in 11 U.S.C. § 502(b)(2). That provision disallows a claim "to the extent that [it seeks] unmatured interest." Numerous courts have recognized this connection between § 502(b)(2) and the pre-Code rule. *See, e.g.*, *Leeper v. Pa. Higher Educ. Assistance Agency*, 49 F.3d 98, 100–01 (3d Cir. 1995); *In re Fesco Plastics Corp.*, 996 F.2d 152, 155–56 (7th Cir. 1993); *In re Monahan*, 497 B.R. 642, 647 (B.A.P. 1st Cir. 2013).

Congress also codified the exception for oversecured creditors. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 373 (1988). Section 506(b) allows a creditor to recover interest if the value

of his security "is greater than the amount of [his allowed secured] claim." And we have held that § 506(b) incorporates the "pre-Code case law" providing that the creditor is entitled to such interest at "the contract rate." *In re Laymon*, 958 F.2d 72, 75 (5th Cir. 1992).

At first blush, it appears Congress also codified the solvent-debtor exception—or something very much like it—in § 726(a)(5). *See In re Colortex Indus., Inc.*, 19 F.3d 1371, 1376 & n.4 (11th Cir. 1994). Section 726(a) lists a descending waterfall of priorities for distributing property in a Chapter 7 bankruptcy:

> (a) Except as provided in section 510 of this title, property of the estate shall be distributed—
> (1) first, in payment of claims of the kind specified in . . . section 507 . . . ;
> (2) second, in payment of any allowed unsecured claim, other than a claim of a kind specified in paragraph (1), (3), or (4) of this subsection . . . ;
> (3) third, in payment of any allowed unsecured claim proof of which is tardily filed under section 501(a) of this title . . . ;
> (4) fourth, in payment of any allowed claim, whether secured or unsecured, for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, arising before the earlier of the order for relief or the appointment of a trustee . . . ;
> (5) fifth, in *payment of interest at the legal rate from the date of the filing of the petition, on any claim* paid under paragraph (1), (2), (3), or (4) of this subsection; and
> (6) sixth, to the debtor.

11 U.S.C. § 726 (emphasis added). If the debtor's estate is sufficient to pay items 1 through 4, then creditors should also get post-petition interest (item 5) before the debtor can recover any surplus (item 6).

No. 17-20793

This principle applies in Chapter 11 cases too. Chapter 7 and Chapter 11 bankruptcies generally run along different tracks.[4] But § 1129(a)(7), commonly referred to as the "Best Interests of Creditors" test, incorporates § 726(a)'s waterfall provision. *See* 7 COLLIER, *supra*, ¶ 1129.02[7][c][iii]. It requires a Chapter 11 plan to provide that impaired creditors "will receive . . . not less than the amount that [they] would . . . receive if the debtor were liquidated under chapter 7," 11 U.S.C. § 1129(a)(7)(A)(ii), including post-petition interest at "the legal rate," *id.* § 726(a)(5).

But § 726(a)'s solvent-debtor exception differs from the pre-Code version in several respects. First, although the pre-Code version applied to all creditors with a contractual entitlement to interest, the Code's version applies to all creditors in Chapter 7 cases, but only impaired creditors in Chapter 11 cases. Section 1129(a)(7) states it applies only "with respect to [an] impaired class of claims." Its plain text does not apply to *unimpaired* claims. *See Cont'l Sec. Corp. v. Shenandoah Nursing Home P'ship*, 193 B.R. 769, 776 (W.D. Va. 1996); *In re Seatco, Inc.*, 257 B.R. 469, 480 (Bankr. N.D. Tex. 2001); 7 COLLIER, *supra*, ¶ 1129.02[7][a] ("[I]f a class is unimpaired under section 1124, its members do not get the protections of the best interest test; instead they are left to their unaltered legal or equitable rights.").

Second, the Code changed the source of recoverable post-petition interest. The pre-Code solvent-debtor exception allowed creditors to recover interest *as part of* a claim. The Code, by contrast, requires solvent debtors to pay post-petition interest *on* a claim.

---

[4] Proceedings under Chapter 7 end in a fire sale, and the debtor is left a pile of ash. *See* 11 U.S.C. §§ 704(a)(1), 721. Proceedings under Chapter 11, however, are designed to reorganize—rather than liquidate—the debtor, which emerges capable of doing business. *See id.* §§ 1107–08, 1141.

17

No. 17-20793

The Code itself highlights the difference. And we infer a distinction in meaning from Congress's distinction in language. *See, e.g.*, ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 170 (2012). For example, § 726(a)(2) refers to payment of a "claim." So too does § 502(b)(2), which refers to a "*claim . . .* for unmatured interest." These provisions prove Congress knew how to write about interest *as part of* a claim when it wanted to. By contrast, § 726(a)(5) provides for "payment of [post-petition] interest . . . *on* [*the*] *claim.*" In doing so, Congress necessarily determined the type of post-petition interest contemplated in § 726(a)(5) is not *part of* the claim itself.[5]

Third, the Code may have changed the applicable interest rate. The pre-Code exception allowed interest at the contract rate because it permitted interest fixed by contract to continue accruing according to the contract's terms. *Ex Parte Marlar*, 27 Eng. Rep. at 98. The Code, however, requires "interest at the legal rate." 11 U.S.C. § 726(a)(5). Some courts interpret "the legal rate" to mean a rate set by statute. *See, e.g.*, *In re Cardelucci*, 285 F.3d 1231, 1234 (9th Cir. 2002) (citing 28 U.S.C. § 1961). Others interpret "the legal rate" to mean one set by contract. *See, e.g.*, *In re Schoenberg*, 156 B.R. 963, 972 (Bankr. W.D. Tex. 1993). If the former are correct, the Code changed the pre-Code rate.

---

[5] Courts routinely talk about § 726(a)(5) as a present-day solvent-debtor "exception" to the general rule—now codified in § 502(b)(2)—barring post-petition interest. *See, e.g.*, *Fesco Plastics*, 996 F.2d at 155–56; *accord In re Shoen*, 176 F.3d 1150, 1153 n.2 (9th Cir. 1999) (McKeown, J., dissenting). For convenience, we have used that terminology here in discussing whether, and if so how, the pre-Code exception survives in the post-Code world. But as the preceding discussion makes clear, that framing misses a key nuance. Section 726(a)(5) is not really an exception to § 502(b)(2) at all because the provisions are talking about two different kinds of interest: Section 502(b)(2) (the general rule) bars interest as part of a claim, while § 726(a)(5) (the so-called exception) allows interest on a claim. *See Energy Future*, 540 B.R. at 113.

No. 17-20793

One final note:  Pre-Code, our Court pioneered the incorporation of England's solvent-debtor exception into American bankruptcy law.  But we did so, at least in part, based on concerns that a solvent debtor could file a voluntary petition in bad faith to avoid paying interest and that a creditor would be powerless to stop the then-*ex-parte* bankruptcy proceedings.  *See Johnson v. Norris*, 190 F. 459, 463 (5th Cir. 1911).  While the pre-Code law left creditors "powerless to resist" a bad-faith petition filed by a solvent debtor, *ibid.*, today the Code allows creditors to seek dismissal based on a debtor's bad faith, *see* 11 U.S.C. § 1112(b)(1); *In re Krueger*, 812 F.3d 365, 373 (5th Cir. 2016).

C.

The next question is what this historical and statutory backdrop means for the creditors' claims to the Make-Whole Amount and post-petition interest. As we explain below, the creditors can recover the Make-Whole Amount if (but only if) the solvent-debtor exception survives Congress's enactment of § 502(b)(2).  We doubt it did.  But we vacate and remand to allow the bankruptcy court to answer the question in the first instance.

The creditors' entitlement *vel non* to post-petition interest is even murkier.  The parties agree the creditors are entitled to some post-petition interest, but they disagree about the rate—namely, whether it is the federal judgment rate or something higher.  To the extent the creditors seek post-petition interest *as part of* their claims, they run into the same issues that affect the Make-Whole Amount.  To the extent they seek post-petition interest *on* their claims, the pre-Code solvent-debtor exception does not countenance it. And the Code itself says nothing about post-petition interest on unimpaired claims for Chapter 11 cases.  It is not clear then what should fill that vacuum, and the bankruptcy court said nothing about it.  We therefore vacate the award

of post-petition interest and remand that question to the bankruptcy court as well.

## 1.

We start with whether the Make-Whole Amount is disallowed by § 502(b)(2). That Code provision requires a bankruptcy court to disallow a claim "to the extent that [it seeks] unmatured interest." 11 U.S.C. § 502(b)(2). Our precedent in turn defines § 502(b)(2)'s "unmatured interest" by looking to economic realities, not trivial formalities. *In re Pengo Indus., Inc.*, 962 F.2d 543, 546 (5th Cir. 1992) ("economic reality," "economic fact," "economic equivalent"). Section 502(b)(2) thus disallows any claim that is the economic equivalent of unmatured interest. *Ibid.*

The debtors make a compelling argument the Make-Whole Amount is one such disallowed claim. We are persuaded by three aspects of the debtors' argument.

First, the Make-Whole Amount is the economic equivalent of "interest." The purpose of a make-whole provision "is to compensate the lender for lost interest." 4 COLLIER, *supra*, ¶ 502.03[3][a]; *see In re MPM Silicones, L.L.C.*, 874 F.3d 787, 801–02 & n.13 (2d Cir. 2017) (The "make-whole premium was intended to ensure that [noteholders] received additional compensation to make up for the interest they would not receive if the Notes were redeemed prior to their maturity date."); *In re Energy Future Holdings Corp.*, 842 F.3d 247, 251 (3d Cir. 2016) (similar); *In re Ridgewood Apartments of DeKalb Cty., Ltd.*, 174 B.R. 712, 720 (Bankr. S.D. Ohio 1994) (similar). So too here. The Make-Whole Amount is calculated by subtracting the accelerated principal from the discounted value of the future principal and interest payments. That captures the value of the interest the Noteholders would have eventually

No. 17-20793

received if the Notes had not been prepaid. *See In re Doctors Hosp. of Hyde Park, Inc.*, 508 B.R. 697, 705 (Bankr. N.D. Ill. 2014).[6]

Second, the interest for which the Make-Whole Amount compensates was "unmatured" when the debtors filed their Chapter 11 petitions. Section 502(b)'s disallowance provisions apply "as of the date of the filing of the petition." On that day, the debtors did not owe the Make-Whole Amount or the underlying interest. The Note Agreement's acceleration clause doesn't change things because it operates as an *ipso facto* clause by keying acceleration to, among other things, the debtor's decision to file a bankruptcy petition. *See In re Lehman Bros. Holdings Inc.*, 422 B.R. 407, 414–15 (Bankr. S.D.N.Y. 2010); *Ipso Facto Clause*, BLACK'S LAW DICTIONARY 957 (Del. 10th ed. 2014). And the parties agree that an *ipso facto* clause is unenforceable. "[W]hether interest is considered to be matured or unmatured for the purpose of [§ 502(b)(2)] is to be determined without reference to any *ipso facto* bankruptcy clause in the agreement creating the claim." 4 COLLIER, *supra*, ¶ 502.03[3][b]; *see* H.R. Rep. No. 95-595, at 352–53 (1977); *In re ICH Corp.*, 230 B.R. 88, 94 (N.D. Tex. 1999). The Class 4 Creditors' only response is the acceleration clause is not an *ipso facto* clause because it could also be triggered by something other than a bankruptcy petition. They cite nothing for that proposition.

Third, those decisions taking a different view are unpersuasive. Some courts have concluded § 502(b)(2) does not cover make-whole provisions on the assumption "they fully mature pursuant to the provisions of the contract." *In*

---

[6] The Class 4 Creditors' principal objection is the Make-Whole Amount is not *actually* interest. For example, they note it compensates the Noteholders not for the use of their money, but for Resources' forbearance from using that money. They add it is paid in a lump sum rather than earned over time. But as already discussed, our precedent interpreting § 502(b)(2) does not require the Make-Whole Amount to *be* unmatured interest; it requires only that it walk, talk, and act like unmatured interest. *See Pengo*, 962 F.2d at 546. Neither party suggests this precedent has been overruled.

*re Outdoor Sports Headquarters, Inc.*, 161 B.R. 414, 424 (Bankr. S.D. Ohio 1993); *see In re Skyler Ridge*, 80 B.R. 500, 508 (Bankr. C.D. Cal. 1987). But *ipso facto* clauses count for nothing when deciding maturity under § 502(b)(2). Others have concluded make-whole provisions are better viewed as liquidated damages, rather than unmatured interest. *In re Trico Marine Servs., Inc.*, 450 B.R. 474, 480–81 (Bankr. D. Del. 2011); *In re Lappin Elec. Co.*, 245 B.R. 326, 330 (Bankr. E.D. Wis. 2000). But those categories are not mutually exclusive. *Doctors Hosp.*, 508 B.R. at 706.

The Class 4 Creditors' most persuasive response is that none of these arguments applies to a *solvent* debtor. First, they try the "absolute priority rule," insisting it bars a solvent debtor from paying stockholders any surplus before fully compensating its creditors. That is only half right. For starters, the absolute priority rule applies when asking whether a plan is "fair and equitable" in a cram-down scenario. 11 U.S.C. § 1129(b)(1). It is not a freewheeling exception requiring a debtor to pay amounts the Code otherwise prohibits. But more importantly, the rule itself builds in the Code's disallowance provisions. It stands for the proposition that a plan "may not allocate any property whatsoever to any junior class . . . unless all senior classes consent, or unless such senior classes receive property equal in value to the full amount of their *allowed claims*." 7 COLLIER, *supra*, ¶ 1129.03[4][a][i] (emphasis added). Thus, the Class 4 Creditors simply beg the question whether § 502(b)(2) disallows the Make-Whole Amount; if it does, the absolute priority rule takes that into account.

Their second argument fares better: If the pre-Code solvent-debtor exception survives in the background of the Code, then the Class 4 Creditors have a point. As explained above in Part III.A, English bankruptcy law gave the creditors of a solvent debtor the "right to interest wherever there is a contract for it." 1 COOKE, *supra*, at 198; *accord Bromley*, 26 Eng. Rep. at 50–

52. And it appears undisputed the Class 4 Creditors would have a contractual right outside of bankruptcy to the interest specified in the Make-Whole Amount. Therefore, the pre-Code solvent-debtor exception would operate as a carve-out from § 502(b)(2)'s general bar on unmatured interest—in much the same way the exception operated as a carve-out from the pre-Code rule barring contract interest after the commission date.

The only question then is whether the pre-Code solvent-debtor exception survives the enactment of § 502(b)(2). As discussed above in Part III.B, Congress carefully incorporated some pre-Code principles but not others. And those principles it did incorporate, Congress sometimes modified. It might be true Congress chose not to codify the solvent-debtor rule as an absolute exception to § 502(b)(2). *See, e.g.*, *Ron Pair Enters.*, 489 U.S. at 243–46; *Timbers of Inwood*, 484 U.S. at 373. On the other hand, we sometimes presume congressional silence leaves undisturbed certain long-established bankruptcy principles. *See, e.g.*, *Midatlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 500–01 (1986); *Kelly v. Robinson*, 479 U.S. 36, 44–47 (1986). The bankruptcy court's resolution of the Code-impairment question prevented it from considering these arguments. "[M]indful that we are a court of review, not of first view," we will not make the choice ourselves. *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005).

One last note on our remand of the Make-Whole Amount. Much of the pre-Code law regarding solvent debtors—including our 1911 decision in *Johnson*—appears motivated by concerns over bad-faith filings. That is, courts worried that without the solvent-debtor exception, solvent debtors would seek bankruptcy protection in bad faith simply to avoid paying their debts. And many of the creditors' arguments before our Court have the same flavor. But Chapter 11 addresses this problem by creating a motion-to-dismiss procedure for bad-faith filings. *See* 11 U.S.C. § 1112(b); *In re Integrated Telecom Express,*

No. 17-20793

*Inc.*, 384 F.3d 108, 112, 118–20 (3d Cir. 2004).  And as far as the record reveals, the Class 4 Creditors never availed themselves of that procedure or complained it was insufficient.  That is presumably because the debtors are both solvent and good-faith filers.  We trust the bankruptcy court on remand also will consider what effect (if any) § 1112(b) has on the solvent-debtor exception (if any exists).

2.

Finally, we turn to post-petition interest.  Both parties agree the creditors are entitled to *some* post-petition interest.  That agreement is founded on Congress's past amendments to the Code.  "Before 1994, [the Code] specified that a creditor receiving full payment of an 'allowed claim' was not impaired." *PPI*, 324 F.3d at 205 (citing former 11 U.S.C. § 1124(3) (1988)).  When "one bankruptcy court held that § 1124(3) allowed a solvent debtor to pay the 'allowed' claims of unsecured creditors in full, excluding postpetition interest, without risking impairment," Congress responded by repealing § 1124(3).  *Id.* at 205–06 (citing *New Valley*, 168 B.R. at 77–80).  Courts have interpreted the relevant legislative history as establishing that a creditor denied post-petition interest is "impaired, entitling [that creditor] to vote for or against the plan of reorganization." *Id.* at 206 (quoting H.R. Rep. No. 103-835, at 47–48).

Even if this entitles the Class 4 Creditors to at least some post-petition interest, it does not establish how much.  The parties point to only one Code provision setting a rate for post-petition interest on awards, § 726(a)(5), but for the reasons discussed above, it does not apply to the creditors here.  Thus, we look outside the Code to see if a more general rule controls.

Here, the pre-Code practice provides no help.  As far as we can tell, English bankruptcy law provided no right at all to interest on a bankruptcy award. *See Ex Parte Marlar*, 26 Eng. Rep. at 98.  It merely allowed contractual interest that was accruing prior to the solvent debtor's bankruptcy to continue

accruing at the contractual rate. *See Ex Parte Mills*, 30 Eng. Rep. at 644. That is why English creditors could recover post-petition interest *as part of* a claim (perhaps like the Make-Whole Amount). But it also is why the solvent-debtor exception does not answer whether the creditors can recover post-petition interest *on* a claim—or how much. As far as we can tell, the modern concept of post-petition interest *on* a claim had no analogy under pre-Code law.

In our view, that leaves two potential paths. The first is the general post-judgment interest statute. *See* 28 U.S.C. § 1961. Section 1961(a) allows interest "on any money judgment in a civil case recovered in a district court" and sets a rate by reference to certain Treasury yields. Courts have applied this provision to bankruptcy proceedings on the theory bankruptcy courts are units of district courts. *See In re Dow Corning Corp.*, 237 B.R. 380, 385–86 (Bankr. E.D. Mich. 1999) (collecting cases). Courts have also treated bankruptcy claims as equivalent to judgments entered on the day the petition was filed. *See, e.g.*, *Wasserman v. City of Cambridge*, 151 B.R. 4, 6 n.2 (D. Mass. 1993) ("Upon the filing of bankruptcy, claims of creditors are treated as the functional equivalent of a federal judgment against the estate's assets."); *Dow Corning*, 237 B.R. at 393 ("Several courts have stated that a creditor's claim is deemed to be a 'judgment' entered on the date of the petition."); *In re Melenyzer*, 143 B.R. 829, 833 (Bankr. W.D. Tex. 1992) ("From and after the petition date, then, creditors hold the equivalent of a federal judgment against estate assets, enforceable only in federal court . . . . Bankruptcy gives all creditors what amounts to a judgment against the debtor as of the filing date."). This has led at least one court to conclude § 1961 requires post-petition interest on the award at the judgment rate from the date the petition was filed. *See Dow Corning*, 237 B.R. at 393 ("If these courts are correct, then both 28 U.S.C. § 1961(a) and § 726(a)(5) start the interest clock running from the same date.

This viewpoint is sensible given that unsecured claims are valued as of the petition date.").

One benefit of applying § 1961 to the claims of unimpaired creditors in Chapter 11 proceedings could be uniformity. If, as some courts hold, § 726(a)(5)'s reference to "the legal rate" incorporates the rate from § 1961, then all bankruptcy creditors could receive post-petition interest at the same rate. *See Dow Corning*, 237 B.R. at 393. On the other hand, a bankruptcy award back-dated to the petition filing date may prove a poor analogy to ordinary judgments. Or perhaps Congress's failure to apply § 1961 to unimpaired Chapter 11 creditors is meaningful. *See* SCALIA & GARNER, *supra*, at 93 (explaining "[t]he principle that a matter not covered [by a statute] is not covered").

A second potential path is equity. Bankruptcy courts have long been thought of as courts of equity, especially when it comes to awarding interest. *See Vanston Bondholders*, 329 U.S. at 241; *Consolidated Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 527–28 (1941). That might not help where the Code's reticulated statutory scheme has displaced the bankruptcy courts' equitable authority. *See, e.g.*, *Law v. Siegel*, 571 U.S. 415, 421 (2014) ("[W]hatever equitable power remains in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." (quotation omitted)). But by all accounts, the Code says nothing about post-petition interest on unimpaired Chapter 11 claims. So equity might say something.

After all, we know the Class 4 Creditors are by stipulation unimpaired, and § 1124(1) says unimpaired creditors retain their "legal, equitable, and contractual rights." The creditors here have no *legal* right to post-petition interest at the default rates. They do not point to a New York law requiring them to receive post-petition interest. Nor do they have a *contractual* right to such interest. The contractual rates at issue here governed interest paid on

26

amounts owed under the contract, not interest on a bankruptcy award. The contracts did not purport to fix an interest rate that would govern if the parties proceeded to protracted litigation, obtained the equivalent of a "judgment" in bankruptcy court, and then a court awarded interest. But they might have an *equitable* right to post-petition interest. At least one well-reasoned bankruptcy decision has so held: For creditors "to be unimpaired the plan must provide that the Court may award post-petition interest at an appropriate rate if it determines to do so under its equitable power." *Energy Future*, 540 B.R. at 124. Because the bankruptcy court in this case erred in its Code-impairment analysis, we do not have the benefit of its wisdom on these questions.

\*     \*     \*

As we have explained, Code impairment is not the same thing as plan impairment. Because the bankruptcy court found otherwise, it did not address whether the Code disallows the Make-Whole Amount or post-petition interest, and if not, how much the debtors must pay the Class 4 Creditors. To secure plan confirmation, the parties stipulated the debtors would do whatever is necessary to make the creditors unimpaired. The bankruptcy court, therefore, must make that stipulation a reality. For that reason and others explained above, we REVERSE in part, VACATE in part, and REMAND for further proceedings consistent with this opinion.